[No. S012944. Aug. 7, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD RAMIREZ, Defendant and Appellant.

## Counsel

Geraldine S. Russell and Nicholas C. Arguimbau, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Jeffrey B. Kahan and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—On November 7, 1989, defendant Richard Ramirez was sentenced to death for the so-called Night Stalker murders following his convictions of 12 counts of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of second degree murder (§ 187, subd. (a)), five counts of attempted murder (§§ 187, 664), four counts of rape (§ 261, former subd. (2)), three counts of forcible oral copulation (§ 288a, former subd. (c)), four counts of forcible sodomy (§ 286, former subd. (c)), and 14 counts of first degree burglary (§ 459). The jury found true allegations of multiple-murder, burglary, rape, forcible sodomy, and forcible-oral-copulation special circumstances. (§ 190.2.) The court imposed a sentence of death. This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, the judgment is affirmed.

FACTS

*Prosecution's Case*

On the afternoon of June 28, 1984, Jack Vincow arrived at his elderly mother's apartment in Los Angeles and was surprised to find the screen missing from her open living room window and the front door unlocked. The missing window screen was on the floor of the living room, and the contents of the living room were in disarray. He found his mother, Jennie Vincow, dead in her bedroom. Her body was on the bed with her feet at the head of the bed. Her throat had been slashed and her body was partially covered by a blanket. He ran out of the apartment and called the police.

The victim had been stabbed multiple times in her upper chest, neck, arm, and leg and had some wounds on her hands. Her throat had been slashed "almost from ear to ear." It appeared she may have been sexually assaulted. Her dress was partially lifted and her girdle had been pulled down and torn.

The temperature of the deceased's liver was measured and the degree of rigor mortis noted, but the coroner had difficulty estimating the time of death. The temperature of the victim's liver indicated she had been dead only a

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

couple of hours, but that estimate may have been inaccurate, because the body had been covered and the room may have been warm. Other factors, particularly the degree of rigor mortis, indicated the victim had been dead for "anywhere from six to eight hours, up to as long as 72 hours." Jack Vincow had seen his mother alive approximately 24 hours earlier, however, when he had visited her the previous afternoon.

Police recovered fingerprints from the screen found on the living room floor that later were identified as defendant's fingerprints.

Nine months later, on March 17, 1985, shortly before 11:00 p.m., Maria Hernandez entered the garage of the condominium she shared with her roommate, Dale Okazaki, in Rosemead. As the garage door was closing, she unlocked the door to her condominium and heard a noise behind her. She turned to see defendant holding a gun pointed at her face. She raised her hand to shield her face and said something like "don't" or "stop." Defendant approached within a few feet and fired the gun. The bullet hit Hernandez in her hand and apparently was deflected by the keys she was holding. She fell to the floor. She did not lose consciousness, but lay still. Defendant shoved her aside and entered the condominium. The door closed behind him and Hernandez opened the garage door and ran outside. She stumbled and fell. As she got up, she heard a "muffled loud sound." She ran around to the front of the condominium complex and saw defendant leaving the complex. She ducked behind a car as he pointed the gun at her. She said, "please don't shoot me again" and he lowered the gun and ran away.

Hernandez approached the front door of her condominium and found it ajar. Inside, she found her roommate, Okazaki, lying dead on the kitchen floor. She had been shot in the forehead from no more than 18 inches away. Her blouse had been pulled up. Hernandez summoned the police. At a subsequent autopsy, a .22-caliber bullet was retrieved from Okazaki's skull.

Police found on the ground outside the garage a blue baseball-type cap bearing the name of the rock group AC/DC. An associate of defendant's later testified that the cap looked like one defendant wore. Hernandez later identified defendant as her assailant at a police lineup and identified defendant at trial.

About an hour after Dale Okazaki was murdered and Maria Hernandez was shot, shortly before midnight on March 17, 1985, Jorge Gallegos was sitting in his parked car with his girlfriend in front of her residence in Monterey Park when his attention was drawn by the sound of two cars applying their brakes. A car driven by defendant apparently had forced a car driven by Tsai-Lian Yu to the side of the road, where it was forced to stop with its

bumper against the bumper of a parked car. Defendant got out of his car and pulled Yu out of her car as she fought.

Joseph Duenas was in his second-floor apartment when he heard a woman scream "help me." He went onto his balcony and saw Yu struggling with a man near the curb. Duenas grabbed a telephone to call the police and returned to the balcony. He saw the man push Yu away, enter his car, and drive away. As defendant drove past Gallegos, Gallegos could see his profile and noted the license number of defendant's vehicle. Gallegos identified defendant at trial.

After defendant left, Yu crawled a short distance and then lay still. A police officer soon arrived and found Yu breathing but unconscious. She stopped breathing and the officers administered "CPR" until an ambulance arrived. She had been shot twice in the chest at close range and was pronounced dead at the hospital. It later was determined that a .22-caliber bullet recovered from Yu's body had been fired from the same gun as the bullet that killed Dale Okazaki.

One of the victim's shoes was found on the ground and the other was in her car. A torn portion of a $20 bill was on the ground. The car was running with the transmission in reverse. Its headlights were on and the driver's side door was open.

Bruno Polo managed two pizzerias owned by Vincent Zazzara. On March 28, 1985, about 8:30 p.m., Polo went to the home that Vincent Zazzara shared with his wife Maxine to deliver the day's receipts from the restaurant and found the screen door unlocked and the front door ajar. Polo rang the doorbell and called out Vincent's name, but received no response. He placed the receipts in the mail slot, as was his usual practice, and left. When Polo had not heard from Vincent Zazzara by the following morning, he and a fellow employee went back to the Zazzaras' house and found the door in the same position as the night before. They entered and found Vincent Zazzara lying dead on the couch in the den. He had been shot in the head from close range.

Maxine Zazzara's body was found in the bedroom lying on her bed, partially covered by a sheet. Her pajama top had been pulled up, exposing her breasts, and her pajama bottoms had been pulled down around her ankles. She had been shot in the head and neck at close range, stabbed in her neck, cheek, chest, abdomen, and pubic area, and her eyes had been cut out. Her eyes were never found. Drawers had been pulled out in the bedroom and bathroom, and clothing was strewn around the room. It later was determined that two .22-caliber bullets removed from Maxine Zazzara's head and neck had been fired from the same gun later used to kill Chainarong K.

Police discovered that the screen had been removed from a patio window at the Zazzara residence, which had been pried open. A bucket had been placed underneath the window. Footprints on the bucket and in the flower bed were made by an Avia athletic shoe.

On May 9, 1985, an intruder entered a house in Monrovia by removing louvers from a kitchen window and climbing onto a patio chair that had been placed against the wall beneath the window. A shoe print recovered from the kitchen sink near the window was made by an Avia athletic shoe. Defendant's palm print was found on the sink.

On May 14, 1985, about 5:00 a.m., a police dispatcher received a 911 call from a residence in Monterey Park. A man repeated, "Help me, help me." The dispatcher sent an ambulance, which arrived within five minutes. The firefighter who responded found the iron security gate and the front door open. He entered and encountered Yuriko Lillie Doi in a nightgown who motioned toward her husband, William Doi, who was sitting in a chair in the den by a telephone; he was unconscious and breathing with difficulty. Books and papers were strewn around the room. After taking a few labored breaths, Mr. Doi stopped breathing and the firefighters tried to resuscitate him. An ambulance arrived and took him to the hospital where he was pronounced dead. Mr. Doi, who was 65 years old, had been shot in the head with a .22-caliber bullet fired from a Jennings semiautomatic pistol that later was recovered from Jose Perez, a convicted felon who had obtained the gun from defendant.

Mrs. Doi was dressed in a nightgown. She had a thumb cuff[2] on her left thumb and her other thumb had blood on it. Her face was swollen and bruised. The den and bedroom had been ransacked. Dresser drawers were open and clothes had been thrown around the room. Mrs. Doi, who had suffered a stroke prior to this incident, was unable to testify at trial.

A screen had been removed from an open bathroom window and was lying on the ground. Outside the window, the police found footprints from an Avia athletic shoe.

Linda Doi-Fick, the daughter of William and Yuriko Doi, later identified several items of property that had been taken from her parents' home, including her mother's wallet and pieces of jewelry, which had been recovered from Felipe Solano, who had purchased the items from defendant.

Launie Dempster, who delivers newspapers, testified that she had seen defendant in a car parked near the Dois' home an hour and a half before the attack.

---

[2] A restraining device similar to handcuffs that attach to the subject's thumbs.

· On May 31, 1985, Carlos Valenzuela noticed that newspapers had been left in the driveway of the house shared by 83-year-old Mabel Bell and her 79-year-old sister, Florence L. He knocked on their door, but received no reply. The next day, he returned and knocked on the door again. When there was no reply, he entered the house through the unlocked door and found Bell and Florence L. Florence L. was lying on her bed in one bedroom. Bell was lying on the floor next to the bed in another bedroom with a table on her chest. Valenzuela removed the table and left to call the police.

Paramedics arrived and found Bell still breathing and took her to a hospital. She was comatose. Her skull had been fractured; the injury could have been caused by a hammer. She had a black eye. A red circle with a star in it (a pentagram)[3] had been drawn on her thigh, perhaps using lipstick. She had injuries on her body caused by burns. Bell died from her injuries about a month later in July, 1985. In the other bedroom, Florence L.'s wrists had been bound using an electric cord and her ankles were taped together. Above the bed, a pentagram had been drawn on the wall. A tube of lipstick was found on the floor. A hammer lying on a table next to the bed had blood and hair on it. Florence L. was taken to a hospital, where an examination revealed evidence that she had been sexually assaulted. She had a puncture wound in her head, two black eyes, and her face was bruised. Florence L. later regained consciousness, but police were unable to communicate with her.

The house had been ransacked. A partial shoe print found on an unplugged clock was consistent with an Avia athletic shoe. Several items taken from the residence later were recovered from Felipe Solano, who had purchased the items from defendant.

Before dawn on May 30, 1985, Carol K. was awakened in her Burbank home by defendant. He may have entered through an unlocked "doggie door" in the back door. He was standing over her bed, holding a gun, and shining a flashlight in her eyes. Defendant ordered her to "get up and don't make any noise." He took her into the bedroom of her 12-year-old son, woke him up, and handcuffed her to her son. He called her names and repeatedly asked where was her money, jewelry, and other property. Defendant ran from room to room, ransacking the house. He found her wallet and removed her money. Defendant made Carol K. and her son lie on the floor and covered them with a sheet. He then removed the handcuffs from Carol K., handcuffed her son behind his back, and put him in a closet. Defendant took Carol K. to her bedroom, put the gun to her head and threatened to kill her, then tied her

---

[3] A pentagram is "A five-pointed figure formed by producing the sides of a pentagon both ways to their points of intersection, so as to form a five-pointed star . . . . Formerly used as a mystic symbol and credited with magical virtues." (11 Oxford English Dict. (2d ed. 1989) p. 495.)

hands behind her with a pair of pantyhose. He forced her to kneel with her head on the bed and covered her head with a pillow. Periodically, he punched her in the back. He ordered her to lie on the bed and raped her and sodomized her. He brought her son from the closet and handcuffed them together to the bed. Defendant said, "I don't know why I'm letting you live. . . . I've killed people before." He threatened to have a friend come back and kill her if she went to the police. Defendant left and they called the police.

The victim later identified defendant in a lineup and at trial and identified several pieces of jewelry that police had recovered from Felipe Solano, who had purchased the items from defendant.

Mary Cannon was a widow in her 80's who lived alone in Arcadia. On the morning of July 2, 1985, a neighbor, Frank Starich, noticed that a window screen was lying on the front porch and her newspaper was in the driveway. He knocked on the door, but received no response, so he retrieved an extra key Cannon had given him. Starich and his wife entered the house but soon left to call the police when they saw that things in the house had been thrown on the floor. The police arrived and found Cannon lying dead on the bed. She had been strangled and beaten and stabbed in the neck. Her nose was broken and both eyes blackened. She had a large, "extremely lethal," wound in her neck. A window in the bedroom was open and the bedroom had been ransacked.

On the carpet and on a tissue, police found shoe prints from an Avia athletic shoe.

Several days after Cannon was murdered, shortly after midnight on July 5, 1985, 16-year-old Whitney B. dressed for bed and sat down on her bed with the light on. Several hours later, she awoke lying facedown on her bed covered with blood. She had multiple skull fractures, which could have been caused by a tire iron that had been left by her bed. A physician later testified, "This was the most massive head injury I've ever seen. She had greater than forty inches of linear lacerations criss-crossing every direction on her head." She had been strangled, which resulted in a fractured larynx, and had black eyes. She summoned her father, who called the police.

The screen had been removed from her bedroom window. A shoe print from an Avia athletic shoe was found in the bedroom.

Two days after the attempted murder of Whitney B., on July 7, 1985, a neighbor of Joyce Nelson noticed that a screen had been removed from Nelson's bedroom window. Finding the front door ajar and seeing that

Nelson's home had been ransacked, he called the police, who found Nelson lying dead on her bedroom floor. She had died from blunt force head injuries and had been strangled. She had multiple bruises, lacerations and contusions on her face.

Between 3:00 and 4:30 a.m. that morning, Launie Dempster, the newspaper deliverer, had seen defendant walking to his car, which was parked next door to Nelson's house in Monterey Park. Dempster returned about 15 minutes later and noticed the car remained but defendant was gone. In the flower bed beneath Nelson's open bedroom window, police found a shoe print from an Avia athletic shoe.

About 3:30 a.m. that same morning, July 7, 1985, Sophie D. awoke in her home in Monterey Park before dawn when the bedroom light went on. Defendant put a gun to her head, covered her mouth with a gloved hand, and threatened to kill her if she made a sound. Defendant handcuffed her, took several items of jewelry and some money, and then raped and sodomized her. Defendant handcuffed the victim to the bed and fled.

The victim yelled for help from a neighbor who was a deputy sheriff. He responded and called the police, who found that defendant had entered the house through a "cat door," which had been bent out of shape.

The victim later identified defendant at a lineup and identified several pieces of jewelry that police had recovered from Felipe Solano, who had purchased the items from defendant. The victim repeated her identification of defendant at trial.

On the morning of July 19, 1985, the bodies of Maxon and Lela Kneiding were discovered in their bed by their daughter, who had come looking for them after they failed to meet her at a restaurant for breakfast as planned. Their throats had been slashed and they had been shot in the neck and head. The bedroom had been ransacked. A .22-caliber bullet recovered from Ms. Kneiding's brain had been fired from the same gun that fired the bullets that killed Dale Okazaki and Tsai-Lian Yu. The victims' daughter later identified several pieces of her parents' jewelry that police had recovered from Felipe Solano, who had purchased them from defendant.

The next day, shortly after midnight on July 20, 1985, Somkid K. was sleeping on her living room couch when she was awakened by the sound of the sliding screen door opening. Defendant entered holding a gun and ordered her to be quiet. He went into the bedroom and shot her husband, Chainarong, in the head, killing him. Defendant returned to the living room and brought Somkid K. into the bedroom, threatening to kill her children if she resisted.

He raped her, sodomized her, beat her, and forced her to orally copulate him. Defendant tied up her eight-year-old son and hit him. He took jewelry, money, and a videocassette recorder and left.

Police found shoe prints from an Avia athletic shoe on the front porch, the rear porch, and inside the house. The victim later identified defendant in a lineup and identified several pieces of jewelry and a suitcase that police had recovered from Felipe Solano, who had purchased them from defendant. A .22-caliber bullet recovered from Chainarong K.'s head had been fired from the same gun that fired the bullets that killed Vincent and Maxine Zazzara.

Early in the morning on August 5, 1985, Virginia Petersen woke up to find defendant walking into her bedroom pointing a gun at her. She asked who he was and demanded that he leave. He told her to be quiet, asked, "Where is it?" and then shot her in the face. Her husband, Christopher Petersen awoke and sat up and defendant shot him in the head, but he did not lose consciousness. He jumped from the bed and chased defendant, who fired at least two more shots and then fled through a sliding glass door that had been left unlocked. Christopher Petersen drove his wife to the hospital.

Virginia Petersen later identified defendant at a lineup and at trial.

Before dawn on the morning of August 8, 1985, Sakina A. was awakened by the sound of defendant shooting her husband, Elyas, in the head as he lay next to her, asleep. Defendant struck Sakina A. in the head and handcuffed her hands behind her back. He continued to beat her, forcing her to "swear upon Satan" that she would not scream. Defendant blindfolded and gagged the victim before ransacking the bedroom, demanding money and jewelry. Defendant removed the victim's blindfold and gag and she directed him to a briefcase that contained jewelry and to her purse, which contained money. Defendant took a ring and necklace she was wearing. Defendant forced the victim to orally copulate him, then raped and sodomized her. The victim's three-year-old son awoke, and defendant bound his hands and feet and covered his head with pillows. He handcuffed Sakina A. to a doorknob, threatening to return and kill her, her three-year-old son, and her infant child if she called the police. Defendant then fled. Sakina A. untied her son, called in vain for her husband, and screamed for help. Receiving no reply, she sent her son to a neighbor's house by promising the child that the neighbor would give him popsicles and candy bars. The neighbor returned the child to his home, found Sakina A., and summoned the police.

Police found a sliding glass door had been pried open. Elyas A. had been killed by a single bullet to the head. Subsequent analysis revealed that a

.25-caliber bullet recovered from the victim's head had been fired from the same gun that fired bullets recovered from the home of Virginia and Christopher Petersen.

Sakina A. later identified defendant at a lineup and identified a television, a videocassette recorder, and several pieces of jewelry that police had recovered from Felipe Solano, who had purchased them from defendant. The victim repeated her identification of defendant at trial.

On August 30, 1985, law enforcement officers had focused their suspicion upon defendant and obtained a photograph of him, which they distributed to law enforcement agencies throughout Southern California and released to the news media. Defendant's photograph appeared in the newspaper the next morning.

On the morning of August 31, 1985, Manuela Villanueva was sitting in her parked car when defendant ran up and demanded her car keys. She ran out of the car and called for help. Frank Moreno and Carmelo Robles responded and chased defendant down an alley. Defendant climbed over a fence and encountered Fastino Pinon, who was working on his car, which was running. Defendant entered the vehicle, saying he had a gun, but Pinon attempted to pull defendant from the vehicle. They struggled as the car moved and struck a chimney. Defendant left and ran toward the street.

Angelena Delatorre was sitting in her parked car across the street from Pinon's house when defendant demanded her car keys. She refused and he pulled her out and entered her car. She screamed and her neighbor, Jose Burjoin, responded and ordered defendant to leave. Delatorre's husband, Manuel, arrived and struck defendant on the head with a steel bar. Defendant left the car and ran down the street. Manuel Delatorre pursued and struck defendant on the head a second time, causing defendant to fall. He stayed with defendant until the police arrived, as a crowd formed. Some people in the crowd were holding the newspaper with defendant's photograph on the front page. On the ride to the police station, defendant asked the officer to "just shoot me," saying he wanted to die. He said, "all the killings are going to be blamed on me."

At the police station, defendant spontaneously confessed: "I want the electric chair. They should have shot me on the street. I did it, you know. You guys got me, the Stalker. Hey, I want a gun to play Russian Roulette. I'd rather die than spend the rest of my life in prison. Can you imagine the people caught me, not the police." Defendant laughed and then added: "You think I'm crazy, but you don't know Satan." He hummed the song "Night Prowler" by the rock group AC/DC.

Defendant continued: "Of course I did it, you know that I'm a killer. Give me your gun, I'll take care of myself. You know I'm a killer, so shoot me, I deserve to die. You can see Satan on my arm." Defendant moved his shirt sleeve to reveal a pentagram drawn on his left shoulder.

On September 2, 1985, a guard saw defendant in his jail cell bleeding from his right palm. Defendant used his blood to draw a pentagram on the floor and write the number 666. On October 24, 1985, during defendant's arraignment in municipal court, defendant turned to the audience, raised his hand, and said, "Hail Satan." A pentagram and the number 666 appeared on defendant's palm. On October 30, 1986, defendant called a guard over to his jail cell, displayed photographs of two of the murder victims, and said: "People come up here and call me a punk and I show them the photographs and tell them there's blood behind the Night Stalker and then they go away all pale."

### Defense Case

The defense focused on the lack of physical evidence tying defendant to the charged crimes, attacked the reliability of the identifications of defendant, and offered the alibi that defendant was in Texas when the crimes against Mabel Bell, Florence L., and Carol K. were committed.

The manager of Jennie Vincow's apartment building testified that the windows in the victim's apartment were in working order following the murder. Forensic pathologist Dr. Werner Spitz testified, based upon the temperature of Vincow's apartment, her body temperature when found, and the circumstance that her body had been covered, that Vincow had been dead four to five hours when her body was discovered.

The police officer who discovered the AC/DC cap at the scene of Dale Okazaki's murder testified the cap was just inside the threshold of the garage. Okazaki's roommate, Maria Hernandez, was shown a photographic lineup that did not include defendant's photograph, and she said one of the photographs resembled her attacker. That person was apprehended and questioned, but then released.

A police officer who responded to the scene where Tsai-Lian Yu was murdered testified that witness Jorge Gallegos told him that he never saw the assailant fight with the victim, did not hear gunshots, and would not be able to identify the assailant. Photographs later taken of the crime scene showed poor lighting conditions that would make an identification of the assailant difficult. A defense pathologist testified that Yu's injuries were consistent with her having been shot while seated in her car.

Photographs were taken of the location near the Doi residence where Launie Dempster, the newspaper deliverer, had seen defendant in a parked car shortly before the murder. The photographer testified that shadows cast by the car's roof would have obscured the face of the driver in a parked car.

Defendant's father, Julian Tapia, testified that defendant was with him in El Paso, Texas, from May 22 or 23, 1985, until May 31, 1985, which included the period during which Mabel Bell was attacked, her sister, Florence L., was murdered and Carol K. was attacked. Hairs recovered in Mabel Bell's house were dissimilar to defendant's hair.

A blood sample recovered from the house in which Mary Cannon was murdered differed from defendant's blood type.

Defendant introduced photographs of the residences of Joyce Nelson and Christopher and Virginia Petersen.

Police showed Sophie D. the same photographic lineup not including defendant's photograph that had been shown to Maria Hernandez, and Sophie D. picked out the same person who, as noted above, was apprehended, questioned and released.

A criminalist examined hairs recovered from the home of Maxon and Lela Kneiding and testified that they were dissimilar to defendant's hair.

A criminalist testified that it was uncertain whether semen collected from Sakina A. could be matched to defendant.

Deputy Public Defender Allen Adashek, who was appointed to represent defendant soon after his arrest, testified regarding the circumstances of the lineup in which defendant was identified by several of the victims. Deputy Public Defender Judith Crawford was present at the lineup as an observer for defendant. Just prior to the lineup, Crawford saw a police officer who was conversing with some children raise his index and middle fingers. When the lineup formed, defendant was the second person in line. Crawford later saw another officer make a similar gesture, raising two fingers. A still photograph taken from a videotape of the lineup showed a police officer raising two fingers.

Psychologist Elizabeth Loftus, an expert in eyewitness identifications, testified that memory degrades over time, that witnesses who are assaulted with weapons focus upon the weapon rather than the features of the assailant, and that members of one race have difficulty identifying members of other races.

Sandra Hotchkiss testified for the defense and acknowledged that she was incarcerated at the California Institution for Women serving a term for burglary. She had committed numerous burglaries with defendant and had seen him sell jewelry to Felipe Solano. Defendant was an amateur burglar. She never saw defendant with a gun and never saw him act violently, even when provoked.

*Penalty Phase*

On September 20, 1989, after the court accepted the jury's guilty verdicts, the prosecution indicated that it did not intend to present any further evidence at the penalty phase, but reserved the right to call rebuttal witnesses. The court granted defendant a one-week continuance to present his case.

On September 27, 1989, defense counsel announced that the defense had made a "tactical decision" not to present any evidence at the penalty phase. Defense counsel then questioned defendant as follows:

"[Defense counsel]: Mr. Ramirez, is it true that do you [*sic*] not wish to take the stand in your behalf during this phase of the trial?

"The Defendant: Yes.

"[Defense Counsel]: And you know that you have a right to take the stand?

"The Defendant: Yes.

"[Defense Counsel]: You know you have a right not to take the stand?

"The Defendant: Yes.

"[Defense Counsel]: You know that Mr. Hernandez [codefense counsel] has been in El Paso talking to friends and relatives about testifying on your behalf?

"The Defendant: Yes.

"[Defense Counsel]: And you agree with the tactical decision that we made not to put on any evidence at this stage of the proceeding?

"The Defendant: Yes."

In response to the court's question, Daniel Hernandez confirmed that he had "done extensive work" interviewing potential witnesses in El Paso, and

had located "witnesses who are willing to come forth," but explained that the defense had decided not to present these witnesses. The court stated: "The court finds that the defendant's waiver of his right to testify and his waiver of the right to put on evidence during the penalty phase, these waivers have been freely, voluntarily and intelligently made and joined in by his counsel."

## DISCUSSION

### A. *Pretrial Issues*

#### 1. *Retention of Counsel*

Citing the decisions in *Wheat v. United States* (1988) 486 U.S. 153 [100 L.Ed.2d 140, 108 S.Ct. 1692] and *People v. Ortiz* (1990) 51 Cal.3d 975 [275 Cal.Rptr. 191, 800 P.2d 547], defendant argues that the trial court violated its "positive, sua sponte duty" under the Sixth Amendment of the federal Constitution and article I, section 15 of the California Constitution "to ensure that appellant would be represented by qualified, effective counsel" by granting defendant's request to substitute counsel. We disagree.

As noted above, defendant was arrested on August 31, 1985. On September 3, 1985, a felony complaint was filed against defendant and the public defender was appointed as counsel. Defendant appeared in court represented by the public defender on September 9, 17, and 27, 1985.

On October 9, 1985, Municipal Court Judge Elva Soper removed the public defender as counsel subject to defendant providing a written agreement retaining Attorney Joseph Gallegos. On October 22, 1985, Judge Soper noted that defendant had failed to provide a written agreement retaining Attorney Gallegos. Defendant indicated he no longer intended to retain Gallegos and instead asked to retain Attorneys Arturo Hernandez and Daniel Hernandez (who are unrelated). The court stated that it had "conducted an extensive examination of the attorneys which the defendant desires to have substituted in as the retained counsel." Noting that defendant had the "right to retain counsel of his choice," the court stated that "it is important the defendant be fully informed regarding his choice of counsel at this point rather than to have serious questions arise later which could result in even greater delay. This court cannot guarantee that such result will not happen anyway; it can only attempt to safeguard against it." The court stated that it had "informed Mr. Ramirez that neither Daniel Hernandez nor Arturo Hernandez have the legal experience which would qualify them to be appointed by this court to represent him in this case, nor do either attorney meet the qualifications set forth by the Los Angeles County Bar for the indigent criminal defense appointment panel."

The court was interrupted by an objection from Arturo Hernandez, stating that he and Daniel Hernandez were not seeking appointment by the court but had been retained by defendant's family and terming the court's remarks "out of order." The court continued, stating: "Court is aware of that. Under the bar plan, an attorney would have to be a member of the California bar for a minimum of ten years, be an attorney of record in at least fifty trials, forty of which must have been submitted to a jury for decision, and thirty of the fifty must have been felonies. The attorneys must have been attorneys of record in at least three cases where the initial charge was a violation for Penal Code section 187 and at least one of those cases must have been submitted to a jury for decision.

"Both attorneys fall short of these qualifications. In addition, it has been brought before the court's attention that both Arturo Hernandez and Daniel Hernandez have been held in contempt by the courts in Santa Clara County on at least two occasions; that on a third occasion a contempt citation was not sustained against Daniel Hernandez—." Daniel Hernandez interrupted the court to object on the ground that this material had been discussed during an in camera hearing, noting that he and Arturo Hernandez had been "assured that any information given to the court would be kept closed." The court continued, stating: "They are a matter of public record, sir. . . . And that there is presently pending in that court another contempt hearing for Daniel Hernandez' failure to appear at a preliminary hearing where the defendant is charged with a violation of section 187 of the Penal Code. [¶] . . . [¶]

"It also has been brought to the court's attention that there is presently pending in Superior Court of Santa Clara County a hearing set for November 12 in the case of People versus Pinon where the district attorney's office has asked the court for—has asked for monetary sanctions against Mr. Daniel Hernandez for his failure to appear at the hearing in the Pinon case.

"In view of the above facts, the court is ordering that both attorneys make full disclosure to Mr. Ramirez of any facts which might bear on their ability to effectively represent him in this case. . . . After this disclosure, if there are any made, the court will, if Mr. Ramirez desires, offer him independent assistance to check any information disclosed to him.

"This court fully recognizes that the defendant has the right to retained counsel of his choice at all stages of the proceedings against him. However, it is also the view of the court that the defendant should be fully informed regarding his choice of counsel, so that he may make his decision knowingly and intelligently. It is a decision which must be made by the defendant. . . . In addition, the court has requested that the agreement retaining Mr. Arturo Hernandez and Mr. Daniel Hernandez be reduced to writing and that

Mr. Ramirez be given the opportunity to discuss that contract with an independent attorney appointed by this court. [¶] . . . [¶]

"For these reasons, the court is going to take the matter of the substitution of attorneys under submission until October 24, 1985, to allow the defendant to investigate the attorneys he now wishes to hire, if he so desires, and for him to have the contractual agreement looked at by an independent attorney. For that purpose the court has appointed attorney Victor E. Chavez of Los Angeles County."

On October 24, 1985, the prosecutor, defendant, Gallegos, Arturo Hernandez, and Daniel Hernandez appeared in camera before the municipal court. Arturo Hernandez represented that defendant had entered into a written contract retaining him and Daniel Hernandez as his attorneys. The court had the following exchange with defendant:

"The Court: Since you are bilingual, I want to inquire: the contract was written in English?

"The Defendant: Yes. And I did read it.

"The Court: Did you read the entire contract?

"The Defendant: Entirety.

"The Court: Did you have any questions regarding any of the conditions in that contract?

"The Defendant: No questions.

"The Court: Did you understand each item in that contract?

"The Defendant: Completely.

"The Court: You are aware that the court did provide an independent attorney for you to discuss any questions you might have with him?

"The Defendant: Yes. He was provided and he did visit me yesterday, but I refused to see him."

The court further questioned defendant regarding the possibility of a conflict between him and his counsel, and defendant stated he understood but felt there would be no conflict. Defendant declined the court's offer to permit

defendant to speak to an independent attorney. The court invited defendant to request to speak to an independent attorney "if at any time in the future you change your mind."

The in camera hearing concluded and, in open court, defendant acknowledged that he wished to substitute Arturo Hernandez and Daniel Hernandez as his counsel. The court relieved Gallegos as counsel and permitted the substitution. More than three years later, on March 6, 1989, during the presentation of the prosecution's case-in-chief, the trial court appointed Attorney Roy Clark as an additional cocounsel for defendant.

■ As noted above, defendant argues that the trial court erred in granting his request to substitute counsel, but the cases he cites do not support his assertion that the trial court had a sua sponte duty to ensure that he would be represented by qualified, effective counsel. To the contrary, the United States Supreme Court has just reiterated that an element of a defendant's right to counsel "is the right of a defendant who does not require appointed counsel to choose who will represent him. [Citations.]" (*United States v. Gonzalez-Lopez* (2006) 548 U.S. ___ [165 L.Ed.2d 409, 126 S.Ct. 2557].) A criminal defendant has a qualified right to retain counsel of his choice, and the trial court can deny a defendant's timely request to substitute counsel only if it " 'will result in significant prejudice to the defendant.' " (*People v. Gzikowski* (1982) 32 Cal.3d 580, 587 [186 Cal.Rptr. 339, 651 P.2d 1145].) "The right to effective assistance of counsel [citations] encompasses the right to retain counsel of one's choice. [Citation.] Though entitlement to representation by a particular attorney is not absolute [citation], 'the state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources—and . . . that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case' [citation]." (*Id.* at pp. 586–587.) We observed in *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 615 [180 Cal.Rptr. 177, 639 P.2d 248]: "[C]hosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible." (Fn. omitted.)

In *Wheat v. United States, supra,* 486 U.S. 153, 157, the trial court denied the defendant's request to substitute counsel because it found that the proposed attorney had an " 'irreconcilable conflict of interest' " that the defendant was not permitted to waive. The high court ruled that the trial court did not err in denying the defendant's request to substitute counsel, stating, "where a court justifiably finds an actual conflict of interest, there can be no

doubt that it may decline a proffer of waiver, and insist that defendants be separately represented." (*Id.* at p. 162.)

The defendant in *People v. Ortiz, supra,* 51 Cal.3d 975, retained private counsel, but his first trial ended in a mistrial and he became indigent prior to the retrial. He moved to discharge his attorney and obtain appointed counsel. The trial court denied his request to discharge counsel on the grounds that the defendant had not shown that his attorneys were incompetent. This court reversed the ensuing judgment of conviction, holding that the trial court erred in requiring the defendant to demonstrate that his attorneys were incompetent before allowing him to discharge them.[4] (*Ortiz,* at p. 987.) We described the right of a criminal defendant to counsel and to present a defense as "among the most sacred and sensitive of our constitutional rights" and cautioned that "the state should keep to a 'necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best.'" (*Id.* at p. 982.) We recognized in *Ortiz* "the value we place on allowing defendants to defend themselves as they deem best, absent prejudice to themselves or unreasonable delay in the processes of justice" and "the importance of the right to counsel of choice and the sensitive nature of the relationship between a criminal defendant and his lawyer." (*Id.* at p. 987.) Moreover, a trial court must exercise caution when denying a defendant's request to substitute counsel, because "[r]eversal is automatic . . . when a defendant has been deprived of his right to defend with counsel of his choice. [Citation.]" (*Id.* at p. 988.) "The right to counsel of choice is one of the constitutional rights most basic to a fair trial. Accordingly, it is clear that a criminal defendant need not demonstrate prejudice resulting from a violation of that right in order to have his conviction reversed." (*Ibid.*)

■ Defendant cites no case, and we are aware of none, in which a conviction was reversed because the court granted the defendant's request to substitute counsel. A defendant whose request to substitute counsel is granted cannot complain on appeal that the trial court should have denied that request. The defendant's only contention on appeal in such circumstances can be that he or she was denied effective assistance of counsel. (See *Wheat v. United States, supra,* 486 U.S. 153, 161 ["If a district court agrees to the

---

[4] Counsel in *Ortiz,* Daniel Hernandez and Arturo Hernandez, are the same attorneys who represented defendant in this case. Defendant twice asserts in his opening brief that in *People v. Ortiz, supra,* 51 Cal.3d 975, "this Court held that both Daniel Hernandez and Arturo Hernandez should properly have been discharged by the trial court as retained counsel on the defendant's motion based on their incompetence in a pending murder case." This does not accurately describe our decision in *Ortiz.* As noted above, we held that a criminal defendant who has retained counsel but becomes indigent may discharge his or her retained counsel and seek appointment of counsel without demonstrating that retained counsel is ineffective. We did not hold that Daniel Hernandez and Arturo Hernandez provided ineffective representation. To the contrary, we noted that, on remand, the superior court might appoint them as counsel.

multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance."].) Defendant expressly does not claim on appeal that counsel were ineffective, noting that "[a] claim of ineffective assistance of counsel will be separately presented in a related petition for writ of habeas corpus."

Curiously, defendant cites our decision in *Drumgo v. Superior Court* (1973) 8 Cal.3d 930 [106 Cal.Rptr. 631, 506 P.2d 1007], for the proposition that the trial court has a "duty to ensure that any counsel *appointed* to represent the accused is competent and qualified to conduct the defense" (italics added), adding: "That is precisely the obligation involved in the present case which the trial court failed to meet." But Daniel Hernandez and Arturo Hernandez were not appointed by the court, they were retained by defendant. Our decision in *Drumgo*, accordingly, has no application here.

Contrary to defendant's assertion, the trial court in the present case did not find that Daniel Hernandez and Arturo Hernandez were unqualified to be retained as counsel by defendant. The court simply made certain that defendant was " 'fully informed regarding his choice of counsel' " (*ante*, at p. 419) by observing that the Hernandez attorneys did not meet the standards required of attorneys appointed by the court to represent capital defendants, noting that both attorneys had been held in contempt on at least two occasions, requiring both attorneys to disclose to defendant " 'any facts which might bear on their ability to effectively represent him in this case,' " and offering defendant the assistance of independent counsel "to check any information disclosed to him." (*Ante*, at p. 420.) The trial court correctly recognized " 'that the defendant has the right to retained counsel of his choice.' " (*Ante*, at p. 420.) The Sixth Amendment "commands . . . that the accused be defended by the counsel he believes to be best." (*United States v. Gonzalez-Lopez, supra*, 548 U.S. at p. ___ [165 L.Ed.2d at p. 418].) The trial court did not err in granting defendant's request to substitute counsel.

### 2. *Conflict of Interest*

Defendant claims that he was denied the right to conflict-free counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution because the trial court failed to conduct an adequate inquiry into whether his attorneys suffered from a conflict of interest stemming from their retainer agreement with defendant's family.

When he and Daniel Hernandez were seeking to be substituted as counsel for defendant, Arturo Hernandez stated they had entered into a written

contract with defendant, adding: "Also, the other parties that have retained us, his family, who are also liable, have acquired some financial responsibility to us due to that contract." The court had the exchange with defendant, which is quoted above, in which defendant stated he had read and understood the contract. This exchange then continued as follows:

"The Court: . . . You understand because your attorneys have a contract with you and with your family, those two contracts may at some point be in conflict; the contract with the family may present a conflict at some point with the contract with you? Do you understand that possibility does exi[s]t?

"The Defendant: It exists, but I feel there will be no conflict.

"The Court: You may be waiving any conflict. I just want to make perfectly sure you understand.

"The Defendant: I understand. I understand.

"The Court: All right. Do you realize the contract may contain certain provisions which may create potential areas of conflict between you and your attorneys?

"The Defendant: I understand.

"The Court: Do you understand it is not the court's desire in any way to change any of the terms of this contract; it is only my desire to make sure you understand those terms and any potential problems that these terms may create; all I want to know is that you do understand?

"The Defendant: I do understand.

"The Court: Okay. Understanding that, do you wish at this time the opportunity to talk to an independent attorney?

"The Defendant: No. I waive that.

"The Court: All right. Do you understand if at any time in the future you change your mind and desire to obtain independent legal advice regarding the contract, you have the right to ask the court to appoint an attorney to discuss that matter with you?

"The Defendant: Yes.

"The Court: All right. Both Messrs. Hernandez, I have some question because last time when you left the courtroom, you made some comment about going to see your 'client,' the 'client' obviously being the family. I do wish to impress upon you the importance of Mr. Ramirez being in the contract, and that has to have prime consideration. Because of the two contracts, the court will request if at any time there is the slightest possibility that a potential conflict might exist, you immediately inform whatever court this is in so that that problem can be raised and taken care of. Do you understand the court is ordering you [to] do that?

"Mr. Arturo Hernandez: We understand fully; and, for the record, we have indicated to the court in the past that at this point we anticipate no conflict of interest. We have our standard retainer agreement that we have used in many, many different felony cases, including murder cases. We have no question in our mind at this point that there is a conflict in this case; however, we realize the concerns of the court. As we stated before, we have no knowledge of any potential conflicts; but if there are any, we will notify whatever court this case is before.

"The Court: All right. Do you realize, both Messrs. Hernandez, the family funds may be insufficient to adequately reimburse you for your services in this matter and, recognizing that fact, do you understand it may be necessary once you are attorneys of record in this case to perform some or all of your services on a pro bono basis?

"Mr. Arturo Hernandez: We realize that, your honor, and we are willing to undertake that risk.

"The Court: Mr. Daniel Hernandez, you are nodding your head 'yes.' Do you—

"Mr. Daniel Hernandez: Yes. I agree with that.

"The Court: To the court inquiry as to the extent of your contract, does it cover through the preliminary hearing?

"Mr. Arturo Hernandez: It covers through the trial, your Honor, and any post-trial remedies that my client may have.

"The Court: The filing of any notices of appeal?

"Mr. Arturo Hernandez: That's correct.

"The Court: Have you disclosed to Mr. Ramirez any facts, both negative and positive, which would bear not only on your ability to represent him but on any publicity that might come from your representation?

"Mr. Arturo Hernandez: Yes, we have. We have fully discussed with him on several occasions our background, and he is satisfied and he is willing to undertake our retainment in this case.

"The Court: Mr. Ramirez, are you satisfied with the disclosures that have been made to you?

"The Defendant: Yes, Ma'am."

Defendant asserts that the above quoted inquiry of counsel was deficient because the court "failed to determine the nature of the terms and conditions" of the retainer agreements entered into between defendant and counsel and defendant's family and counsel, failed to determine the impact of counsels' agreement with the family on their representation of defendant, and "failed to consider the impact of the agreements with respect to counsels' purported waiver of appellant's right to a full and proper inquiry regarding his mental competency." Defendant asserts that counsels' expressed willingness to represent defendant pro bono, if necessary, "deepened the appearance of grave conflicts of interest, triggering the trial court's duty of inquiry."

■ " 'The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest.' [Citation.] ' "Conflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.' " ' [Citation.] [¶] Under the federal Constitution, when counsel suffers from an actual conflict of interest, prejudice is presumed. [Citation.] This presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." ' [Citation.] An actual conflict of interest means 'a conflict that affected counsel's performance-as opposed to a mere theoretical division of loyalties.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 673 [27 Cal.Rptr.3d 360, 110 P.3d 289], italics omitted.)

An actual conflict of interest occurred in *Holloway v. Arkansas* (1978) 435 U.S. 475, 484 [55 L.Ed.2d 426, 98 S.Ct. 1173] (*Holloway*), in which indigent codefendants were represented by a single appointed attorney who represented that he had received confidential information from each defendant that created a risk of conflicting interests, but no conflict of interest was found in *Cuyler v. Sullivan* (1980) 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708] (*Sullivan*), in which three codefendants were represented jointly by retained counsel in separate trials. The high court observed that the trial court

was not obligated to investigate whether counsel's representation of multiple defendants created a conflict of interest, in the absence of an objection by the defendant, stating that "nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. .. . Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." (*Id.* at pp. 346–347, fns. omitted.)

"[T]he rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance . . . ." (*Mickens v. Taylor* (2002) 535 U.S. 162, 172–173 [152 L.Ed.2d 291, 122 S.Ct. 1237] (*Mickens*).) The defendant in *Mickens* claimed he had been denied effective assistance of counsel because his appointed attorney earlier had represented the murder victim on a juvenile matter. The high court denied relief, distinguishing *Holloway* on the basis that counsel had not "protested his inability simultaneously to represent multiple defendants." (*Mickens*, at p. 173.)

The present case does not involve concurrent representation of multiple defendants as in *Holloway* and *Sullivan*, or even prior representation of the victim as in *Mickens*. Defense counsel in the present case had entered into a contract with both defendant and his family to represent defendant, which defendant now claims created a possible financial conflict of interest. The trial court conducted an extensive and appropriate inquiry into defendant's awareness of the possibility of a conflict of interest, offered defendant separate counsel to advise him, and obtained assurances from defense counsel that no such conflicts existed or were likely to arise. The trial court did not err and was not required to review the terms and conditions of the retainer agreement.

Defendant expressly "does not raise an assignment of error as to counsel's conflicts of interest with respect to the retainer agreements," preferring to raise this issue in a subsequent petition for writ of habeas corpus.

Defendant contends that his waiver of his right to conflict-free counsel was defective. We need not, and do not, decide whether defendant validly waived his right to conflict-free counsel because defendant has not shown, and expressly disclaims an intention to show on appeal, that he was denied his right to conflict-free counsel.

### 3. *Competency to Stand Trial*

Defendant claims that the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution because it abused its discretion under section 1368 in denying Defense Counsel Gallegos's motion for a psychiatric evaluation of defendant.

Prior to the in camera hearing on October 24, 1985, referred to above, at which the court substituted Arturo Hernandez and Daniel Hernandez as counsel, Defense Counsel Gallegos appeared in camera in the municipal court with former defense counsel, Deputy Public Defender Henry Hall, and asked the judge to order a "psychiatric evaluation" of defendant "as to his present mental state, his ability to choose his own attorney and other related matters concerning this trial." As noted above, the municipal court had taken under submission defendant's request to substitute new counsel in place of Attorney Gallegos. Gallegos stated he was concerned by a news report he heard on the radio "indicating my client wanted to plead guilty to 14 counts of murder providing the district attorney's office would drop the counts involving minor children." The court noted that it previously had ordered a psychiatric evaluation of defendant at the request of the public defender, who then represented defendant. Deputy Public Defender Hall stated that the psychiatrist had met with defendant "for approximately 10 or 15 minutes, at which point Mr. Ramirez refused to speak with him anymore." Based upon this short interview, and his observations of defendant before and after the interview, the psychiatrist concluded, according to Hall, that defendant was "borderline in terms of his competence," but he "couldn't say for sure." Hall added that the psychiatrist stated that, if forced to reach a conclusion, "he would have to say [defendant] was competent but borderline so."

Following a recess, the in camera hearing resumed, as noted above, with the prosecutor, defendant, Gallegos, Arturo Hernandez, and Daniel Hernandez present. The court observed that "[u]p until this point the questions I have asked Mr. Ramirez he has answered in a logical, intelligent fashion. From his questions I at this point do not have any question regarding his ability. He has remembered things I have said at prior hearings and reported them back to me." The court stated it had no doubts about defendant's competency, and defendant interrupted the court to state: "I am sane." Arturo Hernandez added that he and cocounsel "have been visiting with Mr. Ramirez for a lengthy period of time. We have seen him on almost a daily basis. We have conducted extensive conversations with him. We have conducted extensive investigations of the case with him. We have done a tremendous amount of work with him. We have no problems with him understanding, with him being very rational, very intelligent. We have no problems."

The court then had the following exchange with defendant:

"The Court: Mr. Ramirez, could you tell me: how many years of school have you had?

"The Defendant: I have had 11 years of high school [*sic*] and one year of technical in electrical trades, and I have a psychologist in Los Angeles who has qualified me sane.

"The Court: I am just wanting to know your education, sir.

"The Defendant: Oh. Okay.

"The Court: Just answer specifically—

"The Defendant: I don't want to go to no hospital, Ma'am."

As noted above, the in camera hearing concluded, and Arturo Hernandez and Daniel Hernandez were substituted as counsel without the court ordering a psychiatric evaluation of defendant.

We conclude the trial court did not abuse its discretion under section 1368 in denying Defense Counsel Gallegos's motion for a psychiatric evaluation of defendant.

"A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

Section 1368 states: "(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . [¶] (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369."

In *People v. Hayes* (1999) 21 Cal.4th 1211 [91 Cal.Rptr.2d 211, 989 P.2d 645], defense counsel asserted that his client was incompetent and moved for a hearing pursuant to section 1368. The trial court denied the motion, declaring that no doubt had arisen in the court's mind concerning the

defendant's competence because it appeared the defendant understood the nature of the proceedings and was able to assist counsel. We affirmed the resulting judgment, ruling that a trial court is required to conduct a competency hearing under section 1368 only if "substantial evidence of incompetence is introduced," and adding that evidence "that does no more than form the basis for speculation regarding possible current incompetence is not sufficient. [Citation.]" (*People v. Hayes, supra,* 21 Cal.4th at p. 1281.)

In the present case, there was no substantial evidence that defendant was mentally incompetent. Defense counsel's request for a "psychiatric evaluation" of defendant, standing alone, does not require the court to appoint such an expert or conduct a competency hearing. (See *People v. Panah* (2005) 35 Cal.4th 395, 433 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Howard* (1992) 1 Cal.4th 1132, 1164 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) And defense counsel's concern over news reports he had heard concerning defendant's alleged plans provide no insight into defendant's mental processes. The court's observations of defendant raised no question in the court's mind about defendant's competence, and one of the attorneys who was about to be substituted in as counsel vouched for defendant's competence. Under these circumstances, the court did not err in denying defense counsel's motion to appoint a psychiatrist to evaluate defendant.

Defendant further argues that the trial court erred in failing to order a competency hearing sua sponte. Defendant relies upon "the bizarre nature of the criminal acts charged, [defendant]'s bizarre and abnormal behavior following his arrest, and the court's own questions at various court hearings regarding [defendant]'s competence." But none of these circumstances raised a question as to defendant's ability to understand the nature of the proceedings or assist counsel in his defense. "[M]ore is required to raise a doubt [as to a defendant's competence] than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228].)

Moreover, contrary to defendant's suggestion, the trial court did not express a doubt as to defendant's competence to stand trial. On April 14, 1986, during the preliminary hearing in municipal court, defense counsel requested "that we be allowed to talk to you in chambers and without the presence of the prosecutor" regarding a request by defendant not to attend the preliminary hearing. In denying counsel's request to speak to the court outside the presence of the prosecutor, the court stated: "If counsel is of the

opinion that the court ought to be persuaded by what you might say or what I have seen thus far that inquiry should be made pursuant to section 1368, that you got to do in open court. There is no provision for a secret disclosure of counsel's feelings. With respect to that, there is no evidence upon which I might conclude so far that the defendant is in any way unable to understand and participate in the proceedings."

Ten months later, on February 26, 1987, just prior to the weekend recess during a hearing on pretrial motions, the superior court judge sought time estimates from counsel regarding proceedings the following week and asked defense counsel: "Are there any motions that you are considering as to other aspects of this case that should be filed or you are considering filing? 1368 comes to mind." Daniel Hernandez responded: "We've been considering that from the beginning of course and we haven't made a decision on that and we are very aware and concerned about that." The court replied: "So am I. Again I'm not trying to jump in and tell you guys how to run your ship. That is an avenue I think that has to be explored one way or another."

The next month, on March 24, 1987, the court spoke to defense counsel about when they were going to file a severance motion and then added: "The 1368 and related issues I would also like you to consider. I realize that that is going to be a very difficult one for you, but I would like you to get working on that as well."

From the above quoted statements, it is clear the trial court made inquiries into whether defense counsel planned to file a section 1368 motion, but the trial court did not express a doubt as to defendant's mental competency.

### 4. Motion for Change of Venue

Defendant contends the trial court erred in denying his motion for change of venue under section 1033, depriving him of his rights under article I, section 15 of the California Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. We disagree.

The offenses with which defendant was charged occurred between June 27, 1984 and August 8, 1985. Defendant was arrested on August 31, 1985, and the felony complaint against him was filed on September 3, 1985. Nearly a year after his arrest, on July 21, 1986, following the preliminary hearing, defendant filed a motion for change of venue. The trial court conducted an extensive hearing on the motion, which spanned two months. The court viewed hours of videotape recordings of television news broadcasts.

Paul Strand, Ph.D., testified for defendant that during the last week of November 1986, he conducted a telephone survey of 300 persons who were

eligible to be prospective jurors, using a computer program that generates random telephone numbers. The survey revealed that 94.3 percent of those who responded had heard of the case and 52.7 percent were able to recall something about defendant, such as that he was a Satanist or that he looked evil or mean. About half (47.7 percent) indicated that the Night Stalker murders had posed no particular threat to them, while nearly an equal number (46 percent) said their concern for their safety had increased when the murders were occurring. Just over 10 percent of those polled said they had taken special precautions. At the time of the survey, more than a year after defendant was arrested, only 31.7 percent indicated they continued "to have feelings about this case," with the rest agreeing that they had "pretty much forgotten about it."

Slightly more than half of the people questioned (51.7 percent) said that "[b]ased on what [they had] seen or heard" they thought defendant was "responsible" for the Night Stalker murders, while about a third of those polled (34.7 percent) said they would need more information to make a judgment. Only one person (0.3 percent) believed defendant was not responsible for the murders.

Strand testified that the levels of recognition and predisposition were the highest he had ever seen.

Defendant introduced evidence that participation in neighborhood watch programs "probably doubled" while the murders were occurring. Police increased their patrols, gave advice on how to avoid being victimized, and gave free deadbolt locks to the elderly. Gun sales tripled, returning to normal after defendant's arrest.

The trial court denied defendant's motion for change of venue on January 9, 1987, stating it was "not convinced . . . that the survey shows that the pretrial publicity in this case has created an atmosphere where he cannot receive a fair trial." The court described the news coverage of this case as "saturation, as much as they possibly can give," but noted that this was not the only case in Los Angeles that had received such extensive news coverage. The court noted that although the survey indicated that nearly all of those surveyed had heard of the case, and about half said they thought defendant was responsible based upon what they had heard, the survey did not show that the people polled were predisposed or prejudiced. The court concluded: "I don't think that a reasonable likelihood has been made out that a fair trial cannot be had in this county," adding, "You know, of course, that if a panel is brought in and if you go through the panel and the voir dire experience shows that the panel is, in fact, rather than in theory, polluted, that you can make another motion for change of venue at that time."

Section 1033 provides that a defendant's motion for change of venue shall be granted "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) " 'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. ". . . '[T]he reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable.' " [Citation.] "The de novo standard of review applies to our consideration of the five relevant factors: (1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." [Citation.]' [Citations.]" (*People v. Panah, supra,* 35 Cal.4th 395, 447.)

The "nature and gravity" of the present offenses could not have been more serious, but this factor alone does not require a change of venue. (*People v. Jenkins* (2000) 22 Cal.4th 900, 943 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Neither defendant nor the victims were known to the public prior to the crimes and defendant's arrest, so the last two factors—the "community status of the defendant" and the "prominence of the victim" do not support a change of venue. (See *People v. Panah, supra,* 35 Cal.4th 395, 449; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Our attention, therefore, focuses on the two remaining factors—the "nature and extent of the media coverage" and the "size of the community."

The trial court described the media coverage of the murders and defendant's arrest as "saturation, as much as they possibly can give," but noted that such coverage was not unprecedented in Los Angeles County. And defendant did not show that the media coverage was unfair or slanted against him or revealed incriminating facts that were not introduced at trial. (Cf. *Sheppard v. Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507].) Further, the passage of more than a year from the time of the extensive media coverage served to attenuate any possible prejudice and supports the trial court's denial of the motion for change of venue. (*People v. Panah, supra,* 35 Cal.4th 395, 448; *People v. Jenkins, supra,* 22 Cal.4th 900, 944.)

The size of the community also militates against granting defendant's request for a change of venue. (*People v. Panah, supra,* 35 Cal.4th 395, 449; *People v. Coffman and Marlow, supra,* 34 Cal.4th 1, 46; *People v. Jenkins, supra,* 22 Cal.4th 900, 944.) The trial court correctly noted that because of the number of prospective jurors that could be assembled in Los Angeles County, it was likely that an impartial jury could be chosen. And this turned out to be the case. Although only one member of the jury indicated during voir dire that he never had heard of the case, they all stated they had not "formed any opinion as to the guilt or innocence of Richard Ramirez

regarding this case" and could be fair. When asked in the juror questionnaire what, if anything, they had learned about the case, they indicated, at most, only the most general familiarity with the case.[5] They all stated that this information did not make them favor either the prosecution or the defense. One juror added: "I just know he is the one arrested for murders he was to have committed. But I have not said he is guilty or innocent."

The trial court did not err in denying the motion for change of venue.

Citing *Rideau v. Louisiana* (1963) 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417], defendant argues that the trial court's denial of his motion for change of venue deprived him of his rights to a jury trial under the Sixth Amendment to the federal Constitution and to due process of law under the Fifth and Fourteenth Amendments. The defendant in *Rideau* was filmed in his jail cell, the morning after his arrest, flanked by two state troopers. He was interrogated without counsel by the sheriff and confessed to bank robbery, kidnapping, and murder. This film of the defendant's confession was shown three times on a local television station in the small Louisiana parish where the crimes were committed and was seen by a substantial segment of the population of the parish. The trial court denied the defendant's motion for a change of venue, and the defendant was convicted and sentenced to death. The high court held that the defendant was denied due process, concluding that "it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged" because the televised "spectacle" of the defendant confessing to the crimes rendered his subsequent trial "but a hollow formality." (*Id.* at p. 726.)

The circumstances in *Rideau* bear no resemblance to the circumstances in the present case. Although defendant argues that the media coverage of this

---

[5] One juror made no response. The others responded as follows:

"He was labeled the 'Night Stalker' for midnight breakins."

"That he is being accused of murder of several women."

"That there were a number of women murdered."

"Some knowledge due to the news headlines."

"Mr. Ramirez was accused of entering a home in Orange County and slaying someone there."

"I have not learned anything about this case. I briefly saw the accused captured on TV."

"He was arrested as the night stalker."

"General details given by media, arrested and accused of murder."

"That it is called the Night Stalker case & he was supposed to have murdered many people in So. Calif."

"Only that it has something to do with 'the Night Stalker' and that was revealed in the courtroom by the judge."

"He's accused of a feloney [*sic*]."

case was "extensive and inflammatory," he focuses on the extent of the coverage and offers few examples of coverage that could be described as inflammatory. With few exceptions, the media reports were accurate. Defendant's confessions were reported, but these confessions ultimately were admitted into evidence. And the voir dire confirmed that the jury ultimately selected was largely unaware of, or had forgotten, the details of the media coverage by the time of trial.

Defendant argues he was denied a reliable determination of his penalty guaranteed by the Eighth Amendment, citing *Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633], which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." He also cites *Woodson v. North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978], which invalidated a law that provided a mandatory penalty of death for all first degree murders. Defendant fails to explain how either of these cases has any relevance to the present case.

Defendant contends that the trial court failed "to consider a vast array of defense-proffered evidence in support of change of venue," adding that "[t]he trial court erred in refusing to take judicial notice of the defense-proffered exhibits that demonstrated the prejudicial nature of the news media coverage in appellant's case." The trial court viewed several hours of videotapes of media coverage of the present case proffered by defendant. At the end of the second court day of viewing these videotapes, the court allotted defendant one more hour on the following day, saying: "This is all cumulative. All the channels had the same kind of mixture of hard news and fluff, and I don't see any point in sitting here watching, you know, all of the channels. We have now seen Channel 11, and this is Channel 4, and they are the same. And I have no reason to believe that Channel 2 or Channel 7 or 9 or 13 or the rest of them are any different. [¶] So the point I am trying to make to you is this: you may file and lodge all of the cassettes you wish, all those that you have, but I don't think that in my discretion that it is a judicious use of my time to sit there and watch them all. It simply isn't proving anything." "The point is that what you are presenting is cumulative and repetitive and it isn't proving anything. I am aware of the fact that all of the local news media have given inordinate coverage to this case. I know that. And these cassettes that we have seen have refreshed my memory. . . . Your point, in other words, is made regarding the extent of media coverage that has been afforded this case."

Following several days of oral testimony presented by defendant in support of his motion for change of venue, the court permitted defendant time "to file

a statement regarding matters you wish to have judicial notice or acknowledgment of the existence of." The People objected to much of the material submitted by defendant, and the court ruled: "Now I have read that carefully, I have read all of the matters that are attached thereto, *and I am at this time willing to accept and acknowledge that everything set forth in that document is true*, the factual matters set forth therein are true, that this publicity was disseminated to the public throughout the Southern California area about the time indicated." (Italics added.)

The court sustained the People's objection to numerous exhibits on grounds of "lack of foundation and unintelligibility" and lack of authentication, adding: "But again, Gentlemen, I do have knowledge and I will accept the principle that all of the—virtually all of the local news media, including the small outlet media, local newspapers, ethnic-oriented publications, various language publications, have covered this case, if that is the point you are trying to make. Is that the point you are trying to make? [¶] Mr. Arturo Hernandez: Yes. [¶] The Court: I don't think there is any doubt but that that is true, and I accept that that is true." The court then admitted several exhibits "without foundation," stating: "I've got to have some kind of record."

The trial court did not err in failing to admit all of the evidence submitted by defendant in support of his motion for change of venue.

5. *Motion to Sever Counts*

As noted above, defendant was charged in an amended information with 43 offenses—including 13 counts of murder, five counts of attempted murder, 14 counts of burglary, and four counts of rape—arising from 15 separate incidents involving 24 victims during a 14-month period ending in the summer of 1985. The trial court denied defendant's motion to sever some of these counts and try these charges in eight separate trials. Defendant argues on appeal that the trial court erred in denying his motion for severance in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, asserting that this "case could have been easily severed, for example, into four separate groups." The trial court did not err in denying defendant's severance motion.[6]

Section 954 permits related offenses to be charged in a single accusatory pleading unless there is good cause to try them separately: "An

---

[6] Because defendant was tried prior to the effective date of Proposition 115, which was adopted in June 1990 and contains provisions regarding the joinder and severance of criminal charges (see Cal. Const., art. I, § 30, subd. (a); § 954.1), we apply the law predating Proposition 115. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314, fn. 13 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Arias* (1996) 13 Cal.4th 92, 126, fn. 7 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Defendant's motion in the trial court to sever the charges was confusing. Defendant initially moved to sever the charges into "at least six" groups, conceding that the charges involving the Petersen and Elyas A. victims on August 5 and August 8 were properly joined, and that the charges involving the Okazaki, Yu, Doi, Bell, Cannon, Whitney B., Nelson, and Kneiding victims on March 17, May 14, May 29, July 2, July 7, July 5, and July 19 of 1985 were properly joined, but arguing that these two groups of cases should be tried separately and that the charges involving the Sophie D., Carol K., Higgins, and Vincow victims should each be tried separately. In a subsequent pleading, defendant argued the charges should be tried in "eight different trials" involving the following groups of victims: (1) Petersen and Elyas A. on August 5 and 8, 1985; (2) Okazaki and Yu, on March 17, 1985; (3) Zazzara and Chainarong K. on March 28 and July 19, 1985; (4) Higgins;[7] (5) Vincow on June 27, 1984; (6) Bell, Doi, Cannon, Whitney B., Nelson, and Kneiding on May 14 and 29, and July 2, 5, 7, and 19 of 1985; (7) Sophie D. on July 7, 1985; and (8) Carol K. on May 30, 1985. The trial court denied the motion for severance, finding that the charges were "of the same class of crimes," that much of the evidence was cross-admissible, and that there was "a common scheme and design that runs through each of these incidents."

█ On appeal, defendant argues that the charges "could have been easily severed, for example, into four separate groups" involving the following groups of victims: (1) Petersen, Whitney B., Sophie D., and Carol K.; (2) Elyas A., Okazaki, Yu, and Kneiding; (3) Zazzara, Chainarong K., Bell, Cannon, and Nelson; and (4) Vincow. The People correctly point out that defendant did not ask the trial court to sever the charges into these four groups, and the trial court had no sua sponte duty to do so. " 'Section 954 . . . imposes no sua sponte duty of severance on trial courts. That section . . . requires the defendant to make a showing of "good cause" in order to obtain severance, and defendant's failure to request a severance waives the matter on appeal. Nor do we find any authority to support defendant's argument that the Fifth, Sixth, Eighth or Fourteenth Amendments of the United States Constitution, or their California counterparts, impose such a duty.' " (*People v.*

---

[7] The prosecution conceded that the two charges related to Higgins were not properly joined and the court granted the prosecution's motion to dismiss those charges.

*Maury* (2003) 30 Cal.4th 342, 392 [133 Cal.Rptr.2d 561, 68 P.3d 1].)
Accordingly, defendant is limited on appeal to arguing that the trial court
erred in failing to sever the charges into the groups he requested at trial.

All of the charges against defendant were properly joined under
section 954 because they either were "connected together in their commis-
sion" or were "offenses of the same class of crimes." Each of the groups of
offenses suggested by defendant in the trial court included charges of murder
or rape or both. "Murder and rape are assaultive crimes against the person
and, as such, are 'offenses of the same class of crimes' within the meaning of
section 954 and were properly joinable. [Citations.] Because the statutory
requirements for joinder were met, defendant can establish error only on a
clear showing of prejudice. [Citation.]" (*People v. Maury, supra,* 30 Cal.4th
342, 395.)

" ' "The burden is on the party seeking severance to clearly establish that
there is a substantial danger of prejudice requiring that the charges be
separately tried." [Citation.] [¶] . . . Refusal to sever may be an abuse of
discretion where: (1) evidence on the crimes to be jointly tried would not be
cross-admissible in separate trials; (2) certain of the charges are unusually
likely to inflame the jury against the defendant; (3) a "weak" case has been
joined with a "strong" case, or with another "weak" case, so that the
"spillover" effect of aggregate evidence on several charges might well alter
the outcome of some or all of the charges; and (4) any one of the charges
carries the death penalty or joinder of them turns the matter into a capital
case. [Citations.]' " (*People v. Bradford, supra,* 15 Cal.4th 1229, 1315.)

A trial court's denial of a motion for severance "may be reversed only if
the court has abused its discretion. [Citations.] An abuse of discretion may be
found when the trial court's ruling ' "falls outside the bounds of reason." '
[Citation.]" (*People v. Bradford, supra,* 15 Cal.4th 1229, 1315.)

Defendant argues that his motion for severance should have been granted
because "many of the incidents were dissimilar" and, thus, not all of the
evidence would be cross-admissible. Evidence linked some of the groups of
offenses suggested by defendant in the trial court. For example, defendant
argued that the Zazzara and Chainarong K. charges should be tried separately
from the Bell, Doi, Cannon, Whitney B., Nelson, and Kneiding charges, but
these groups of charges were linked by evidence that the same Avia shoe
prints found at the scene of the Zazzara and Chainarong K. crime scenes also
were found at the scenes of the Bell, Doi, Cannon, Whitney B., and Nelson
crimes. And both of these groups of charges were linked to the Sophie D. and
Carol K. charges—which defendant asserted in the trial court should be tried
separately—because defendant sold to Felipe Solano property stolen during
crimes included in each of these groups. In any event, it is not required that

all of the evidence be cross-admissible: "Cross-admissibility of evidence is sufficient but not necessary to deny severance. [Citation.] As the four-part test is stated in the conjunctive, joinder may be appropriate even though the evidence is not cross-admissible . . . ." (*People v. Ochoa* (2001) 26 Cal.4th 398, 423 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

Defendant asserts that the joinder of the charges resulted in gross unfairness and deprived him of a fair trial. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Defendant argues there was an improper "spillover effect" during the guilt phase because "of the joinder of weak and strong counts" and that this effect continued during the penalty phase. Defendant observes that eyewitness identification evidence "established that appellant was the assailant" in the Hernandez and Okazaki, Carol K., Sophie D., Chainarong K., Petersen, Elyas A., Yu, Doi, and Nelson incidents. He argues that these "strong counts" should not have been joined with the "weak counts" involving Bell, Florence L., Cannon, and Nelson in which "there was either no identification evidence or at best weak physical evidence that only tenuously linked appellant to the crimes." These charges can hardly be described as weak. A pentagram had been drawn on Bell's thigh and on the wall near Florence L. Avia shoe prints were found at the scene of the crime and defendant later sold property taken during the crime to Felipe Solano. Avia shoe prints also were found at the scene of Cannon's murder, and defendant was seen sitting in a parked car next door to Nelson's house shortly before she was murdered and Avia shoe prints were found in her flower bed. There was no gross unfairness and defendant was not deprived of a fair trial.

### 6. *Challenge to Jury Venire*

Defendant claims that his jury "was not drawn from a fair cross-section of the population" in violation of Code of Civil Procedure sections 197 and 203, article I, section 16 of the California Constitution, and the Sixth Amendment to the federal Constitution because the methods used to summons the jury venire "resulted in the elimination of a disproportionate number of Hispanics." As explained below, defendant challenged the composition of the master list that was used to summon jurors during the 1987–1988 fiscal year that ended in June of 1988. But jury selection in the present case commenced on July 21, 1988, using prospective jurors summoned using the new master jury list for the 1988–1989 fiscal year. Further, the jury commissioner adopted a suggestion by defendant that significantly increased the representation of Hispanics on this new master list. Defendant's objection to the composition of the old master jury list was rendered moot. Defendant failed to object to the composition of the new master list, and thus forfeited any objection to the composition of the master list actually used to select the jury in the present case.

On January 20, 1988, defendant filed a motion to "quash all existing jury panels" on the ground that Hispanics were systematically underrepresented on the jury venire.[8] An evidentiary hearing spanning several days was held in April and May, 1988.

Raymond Arce, Director of Jury Management, Office of the Jury Commissioner, testified that each fiscal year, usually in May, a master list of potential jurors in Los Angeles County is compiled using records from the county registrar of voters and the California Department of Motor Vehicles. A list of qualified prospective jurors is obtained based upon responses to prospective juror questionnaires sent to persons on the master list. Prospective jurors are randomly summoned from this list of qualified jurors when a court requires jurors.

Dr. Raymond Weeks, a professor of sociology, was called by defendant as an expert on demographics and testified that he analyzed questionnaires of more than 10,000 persons who appeared for jury service in the Central Judicial District from August to mid-December of 1987 and noted that 14 percent identified themselves as Hispanic. Based upon the 1980 census as well as data compiled by California State University, Dr. Weeks estimated that 24.3 percent of the population in the Central Judicial District were Hispanics who qualified for jury service. Dr. Weeks further stated that the Hispanic population had increased proportionately since 1980 and estimated that by 1987, the percentage of the population of the Central Judicial District that were Hispanics who qualified for jury service was actually 26.3 percent. Thus, in Dr. Weeks's opinion, there was an absolute disparity of 12.3 percentage points between the 14 percent of persons who appeared for jury service in the Central Judicial District and identified themselves as Hispanic and the 26.3 percent of the population of the Central Judicial District who were Hispanics who were eligible for jury service. The relative disparity—which is the absolute disparity (12.3 percent) divided by the percentage of Hispanics in the population (26.3 percent)—was 47 percent. (See *People v. Sanders* (1990) 51 Cal.3d 471, 492, fn. 5 [273 Cal.Rptr. 537, 797 P.2d 561].)

At the time, Code of Civil Procedure section 203 provided that "no juror shall be required to serve at a distance greater than 20 miles from his or her

---

[8] Defendant's motion in the trial court also urged that "young persons," and "low income persons" were systematically excluded from the jury venire as well. In a footnote to the reply brief, defendant states he "inadvertently omitted" these two bases for challenging the jury venire in his opening brief, adding without supporting argument or citation of authority that "[t]hese grounds are also asserted as improper bases for underrepresentation and exclusion of potential jurors." We need not, and do not, resolve these contentions. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

residence." (Stats. 1980, ch. 81, § 9, p. 204.) Accordingly, Dr. Weeks also compiled statistics for the area within a 20-mile radius from the courthouse from which prospective jurors actually were drawn and concluded that in 1987 the percentage of Hispanics within a 20-mile radius of the Central Courthouse who were eligible for jury service was 17.5 percent. The absolute disparity between that figure (17.5 percent) and the percentage of Hispanics that appeared for jury service (14 percent) was 3.5 percent. The relative disparity (3.5 percent divided by 17.5 percent), therefore, was 20 percent.

Dr. Nancy Minter, a demographics expert employed by the County of Los Angeles, testified for the prosecution and disagreed that the population of persons eligible for jury service had increased by 1987, pointing out that the growth in the Hispanic population during this period consisted primarily of noncitizens who were ineligible for jury service. According to Dr. Minter, therefore, the absolute disparity between the 14 percent of persons who appeared for jury service and identified themselves as Hispanic and the 16.3 percent of the population within the 20-mile radius who were Hispanics who were eligible for jury service was just 2.3 percent. The relative disparity (2.3 percent divided by 16.3 percent), therefore, was 14 percent.

Dr. Weeks opined that the disparity between the percentage of Hispanics available for jury service and the percentage that appeared for service was caused by the jury commissioner's use of records from the registrar of voters to compile a primary list. A similar list is drawn from the records of the Department of Motor Vehicles (DMV). Duplicate names on the DMV list are eliminated by comparing the full last name and the first four letters of the first name on the two lists. If an exact match is found, that name is removed from the DMV list. The remaining names on the DMV list and all of the names on the registrar of voters list are combined to form the master list. Dr. Weeks testified that using the registrar of voters list as the primary list results in an underrepresentation of Hispanics, because the percentage of Hispanics who are eligible to vote and who actually register to vote "is lower than for other groups in the population." Dr. Weeks also pointed out that the process of eliminating duplicate names from the two lists was inaccurate, because only the exact last name and the first four letters of the first name were compared. Because many members of the Hispanic community share common surnames and first names, Hispanics might be erroneously deleted from the DMV list. The accuracy of determining if names on the two lists were duplicates would be increased if, in addition to the names, the birth date and address of the prospective jurors were compared.

At the urging of the defense, Arce conducted an experiment on a small sample of the registrar of voters and DMV lists, which resulted in an increase from 19 to 26 percent Hispanics when the DMV list was used as the primary

list. Arce stated that in compiling the new master list for the next fiscal year, he intended to compare the entries on the registrar of voters list and the DMV list using addresses as well as names.

On May 31, 1988, the trial court denied defendant's motion to quash the jury venire. The court held that, assuming the defense expert was correct that there was a 3.5 percent absolute disparity between the percentage of jury-eligible Hispanics in the area within a 20-mile radius of the courthouse from which prospective jurors were drawn and the percentage of Hispanics that appeared for jury service, which amounted to a relative disparity of 20 percent, this did "not appear to this court to be of constitutional significance . . . ." The court went on to find "that the petit jury selection process and procedures in Los Angeles County reasonably and practically comply with California Code of Civil Procedure sections 190, et seq." While declining to so order, the court urged the jury commissioner to improve the method used to remove duplicate names from the registrar of voters list and the DMV list by comparing the date of birth listed for duplicate names, noting that "it appears all would benefit."

On June 7, 1988, during a "readiness conference," Raymond Arce testified that a new master list had been compiled to be used in the upcoming 1988–1989 fiscal year and that duplicate names on the registrar of voters list and the DMV list were determined by comparing both the name and the date of birth, which resulted in a master list that was "ten percentage points higher in the Hispanic representation." The percentage of Hispanics on the new master list was 28.4 percent. The new list was already being used to send out juror questionnaires and jurors from the new list would begin appearing in court in mid-July. Jury selection commenced on July 21, 1988.

██ Defendant argues that his jury "was not drawn from a fair cross-section of the population" in violation of Code of Civil Procedure former sections 197 and 203, article I, section 16 of the California Constitution, and the Sixth Amendment to the federal Constitution. But the procedures to which defendant objected in the trial court, and which the trial court found did not produce a constitutionally significant underrepresentation of Hispanics, were not the procedures used to select his jury. In order to preserve this issue for review, the defendant must "object to the panel or move to quash the jury venire on this ground . . . ." (*People v. Lewis* (2001) 25 Cal.4th 610, 634 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Defendant objected to, and moved to quash, the master list of jurors drawn for use in the 1987–1988 fiscal year. Although the trial court overruled defendant's objection and ruled there was no significant disparity in the percentage of Hispanics, the office of the jury commissioner adopted defendant's request to improve the method by which duplicate names were eliminated, which resulted in a significant increase in

the percentage of Hispanics on the new master jury list that was used to select defendant's jury. Defendant's objection to the 1987–1988 master list was rendered moot, because that list was not used to summon the jurors in the present case. Defendant did not object to, or move to quash, the new master list used to select the jury in the present case and thus has forfeited this issue.

Defendant's claim also fails on the merits. At the time of trial, Code of Civil Procedure former section 197 provided: "It is the policy of the State of California that all persons selected for jury service shall be selected at random from a fair cross section of the population of the area served by the court . . . ." (Stats. 1980, ch. 81, § 7, p. 203.) Code of Civil Procedure former section 203 stated at that time: "Each court shall adopt rules supplementary to such rules as may be adopted by the Judicial Council, governing the selection of persons to be listed as available for service as trial jurors. The persons so listed shall be fairly representative of the population in the area served by the court, and shall be selected upon a random basis. Such rules shall govern the duties of the court and its attachés in the production and use of the juror lists. In counties with more than one court location, the rules shall reasonably minimize the distance traveled by jurors. In addition, in the County of Los Angeles no juror shall be required to serve at a distance greater than 20 miles from his or her residence." (Stats. 1980, ch. 81, § 9, p. 204.)

The Sixth Amendment to the United States Constitution guarantees that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." The California Constitution declares that "Trial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) These provisions have been interpreted to entitle a criminal defendant to a jury "selected from a fair cross section of the community." (*Duren v. Missouri* (1979) 439 U.S. 357, 359 [58 L.Ed.2d 579, 99 S.Ct. 664]; see *People v. Burgener* (2003) 29 Cal.4th 833, 855 [129 Cal.Rptr.2d 747, 62 P.3d 1].) " 'That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. [Citation.]' " (*Burgener, supra*, 29 Cal.4th at p. 856.) "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren, supra*, 439 U.S. at p. 364.)

Defendant satisfied the first prong of this test, because Hispanics are a "distinctive" or cognizable group. (*People v. Ochoa, supra,* 26 Cal.4th 398, 426.)

Whether defendant satisfied the second prong by showing that Hispanics were underrepresented in the jury venire depends in part upon how the community that serves as a basis for comparison is defined. Defendant introduced evidence that 14 percent of the persons who appeared for jury service identified themselves as Hispanic. Defendant compared that percentage to both the percentage of jury-eligible Hispanics living in the judicial district in which the trial was held (26.3 percent) and the percentage of jury-eligible Hispanics living within a 20-mile radius from the courthouse (17.5 percent). The trial court selected the 20-mile radius as the community to which to compare the percentage of Hispanics. This was reasonable, because this was the area from which the jurors actually were summoned. At the time, Code of Civil Procedure former section 203 stated that "in the County of Los Angeles no juror shall be required to serve at a distance greater than 20 miles from his or her residence." Consequently, the jurors were summoned from the area within a 20-mile radius of the courthouse.

Relying upon our decision in *Williams v. Superior Court* (1989) 49 Cal.3d 736 [263 Cal.Rptr. 503, 781 P.2d 537], which was filed the year after the trial court ruled in the present case, defendant argues the trial court erred in using the area within a 20-mile radius of the courthouse as the relevant community. But defendant forfeited this issue by failing to object to the trial court's selection of the relevant community. (*People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

In any event, we did not hold in *Williams* that the area within a 20-mile-radius area of the courthouse could not be used as the relevant community for this purpose. The defendant in *Williams* had argued that the relevant community was the entire county, while the People had asserted the relevant community was the judicial district. We noted that "the Court of Appeal rejected both definitions, preferring instead a provocative compromise that defines community as that area within a 20-mile radius of the courthouse." (*Williams v. Superior Court, supra,* 49 Cal.3d 736, 742, fn. omitted.) We ruled that the judicial district, rather than the entire county was the relevant community, but we expressly declined to consider the Court of Appeal's alternate position, because the requirement that no juror in Los Angeles County be required to serve at a courthouse more than 20 miles from his or her residence had since been repealed (*id.* at p. 742, fn. 6): "Inasmuch as the basis for the decision of the Court of Appeal has been eliminated, no purpose is served by an extended discussion of the propriety of using the 20-mile-radius community in determining the population for cross-section analysis." (*Id.* at p. 742, fn. omitted.)

As in *Williams*, we need not decide in the present case whether the trial court erred in using the area within a 20-mile radius around the courthouse as the relevant community for cross-section analysis. Defendant may not raise this issue for the first time on appeal.

Using the area within a 20-mile radius of the courthouse as the relevant community, the trial court ruled that the absolute disparity of 3.5 percent, which translated to a relative disparity of 20 percent, was not constitutionally significant. We agree. In *People v. Burgener, supra,* 29 Cal.4th 833, 856, we observed that it was "uncertain" whether an absolute disparity of 10.7 percent, which produced a relative disparity of 65 percent, was sufficient to satisfy the second prong of the *Duren* test. In *People v. Bell* (1989) 49 Cal.3d 502 [262 Cal.Rptr. 1, 778 P.2d 129] we did not decide whether an absolute disparity of 5 percent between the percentage of Blacks in the community (8 percent) and the percentage that appeared for jury service (3 percent) was constitutionally significantly, but we observed that "[i]t does not appear that a disparity of this degree renders the representation of Blacks on jury venires less than fair and reasonable . . . ." (*Id.* at p. 527.) Based upon these figures, the relative disparity in *Bell* was 62.5 percent. The trial court in the present case was correct that the 3.5 percent absolute disparity and 20 percent relative disparity between the percentage of Hispanics who appeared for jury service and the percentage of Hispanics in the area within 20 miles of the courthouse was not constitutionally significant.

By the time jury selection in the present case commenced on July 21, 1988, the jury commissioner had begun utilizing an improved method for identifying and eliminating duplicate names from the lists drawn from the registrar of voters and the DMV. This change increased the percentage of Hispanics on the master list to 28.4 percent, which is more than both the 17.5 percent of the population within a 20-mile radius of the courthouse and the 26.3 percent of the population in the Central Judicial District. It is clear, therefore, that Hispanics were not systematically excluded from the venire from which defendant's jury was chosen.[9]

### 7. Challenge for Cause to Juror Robert D.

The prospective jurors were sequestered and individually questioned concerning their views on the death penalty as then required by our decision in

---

[9] Defendant argued in his opening brief that the trial court erred in denying his motion for sequestered voir dire of the jury. Defendant asserted that unsequestered voir dire increased the juror's exposure to prejudicial pretrial publicity. In response, the People pointed out that although the court denied defendant's motion for the jurors to be sequestered during the entire voir dire, the prospective jurors *were* questioned individually (i.e., sequestered) regarding bias, and the allegedly prejudicial statements recounted by defendant in his opening brief actually were made during this partially sequestered voir dire. In his reply brief, defendant withdrew this contention.

*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301].[10] In response to questioning by the court, Prospective Juror Robert D. stated that he would not automatically vote to impose the death penalty and, instead, would consider all of the evidence before making a decision. In response to questioning by defense counsel, the prospective juror agreed that he was a strong supporter of the death penalty, rating his support as 8 on a scale of 10. He stated that death was "a just punishment for certain crimes." When asked what crimes he had in mind, he answered: "Mostly murder, I would think." He added that if the defendant were convicted of first degree murder and found to be eligible for the death penalty, he would vote to impose the death penalty unless he were convinced otherwise.

Upon examination by the People, the prospective juror acknowledged that he would weigh and consider the evidence presented and base his decision on that evidence and would not vote "automatically" for anything. He denied that he would always vote to impose the death penalty for first degree murder "no matter what the circumstances that led to that conviction." He stated that he would not "necessarily be committed from the outset to the imposition of the death penalty."

The trial judge then engaged the prospective juror in the following colloquy:

"The Court: . . . If . . . you as [a] juror found a defendant guilty of first degree murder and you also found a special circumstance to be true beyond a reasonable doubt, would that put you in a position where in every case would you always vote for the death penalty?

"Prospective Juror Robert D[.]: I don't think I could say in every case. I will have to judge each case by its own merits."

Defendant challenged Prospective Juror Robert D. for cause, because he indicated he would vote for the death penalty unless he were convinced otherwise. The trial court denied the challenge.

After the jury had been selected and sworn, Prospective Juror Robert D. was examined for selection as an alternate juror. Defendant subsequently exercised a peremptory challenge to excuse Prospective Juror Robert D. and eventually exhausted his peremptory challenges to the alternate jurors.

Defendant argues that Prospective Juror Robert D. should have been excused for cause because he "made it clear . . . that he favored the death

[10] This holding in *Hovey* was "abrogated" by the passage of Proposition 115. (*People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

penalty as the appropriate punishment and would place a burden on a defendant to prove that death was not the appropriate punishment."

 "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so. [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Defendant in the present case exhausted his peremptory challenges to the alternate jurors, but did not express dissatisfaction with the jury ultimately selected. In response to the People's observation that defendant did not request additional peremptory challenges during the selection of the alternate jurors, defendant asserts that such a request would have been futile, because the trial court had denied his earlier request for additional peremptory challenges during the selection of the seated jurors. This does not explain, however, defendant's failure to express dissatisfaction with the jury ultimately selected. As we explained in *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087–1088 [259 Cal.Rptr. 630, 774 P.2d 659], defendant is entitled to relief only "if he can actually show that his right to an impartial jury was affected because he was deprived of a peremptory challenge which he would have used to excuse a juror who sat on his case." Unless, in addition to exhausting his peremptory challenges, the defendant expresses dissatisfaction with the jury ultimately selected, we cannot know whether the earlier denial of the challenge for cause deprived the defendant of a peremptory challenge that he or she would have used to excuse a juror who sat on his case. Accordingly, defendant has not preserved this claim for review.

In any event, the trial court did not err in refusing to excuse for cause Prospective Juror Robert D.

A prospective juror must be excused if his views on the death penalty " 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. Griffin* (2004) 33 Cal.4th 536, 558 [15 Cal.Rptr.3d 743, 93 P.3d 344], quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) We will uphold the trial court's ruling on this question if it is supported by substantial evidence. (*Griffin, supra,* 33 Cal.4th at p. 558.) The trial court's finding are " 'generally "binding" "if the prospective juror's responses are equivocal . . . or conflicting . . . ." ' [Citations.]" (*Id.* at pp. 558–559.) Although the prospective juror in the present case described himself as a strong supporter of the death penalty, he assured the court multiple times that he would not automatically vote for the death penalty and would, instead, reach a decision based upon all of the evidence. Defendant places great emphasis on the prospective juror's statement that he would vote

to impose the death penalty unless he was convinced otherwise, but this comment must be considered in light of the prospective juror's explanation that he would not "necessarily be committed from the outset to the imposition of the death penalty." The trial court's implied finding that the prospective juror's views on the death penalty would not substantially impair the performance of his duties as a juror is supported by substantial evidence.

### 8. Shackling of Defendant

Defendant contends that the circumstance that he was restrained by leg shackles deprived him "of his due process and fair trial rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

On the first day of jury selection, July 21, 1988, the court informed counsel outside the hearing of the jury that the bailiff reported that defendant was unhappy wearing a leg brace. The court noted that the brace was less obtrusive than leg chains and thus to defendant's advantage. Defense counsel agreed, but indicated that defendant preferred leg chains. At defendant's request, the court ordered that the brace be replaced by leg chains. On August 2, 1988, during a discussion of courtroom security measures, the court noted in general terms that it had ordered increased courtroom security, including the use of a metal detector, because it had "received information with regards to threats about individuals involved in this case."

On December 19, 1988, before the prospective jurors were brought into the courtroom, the prosecutor noted that the proceedings had been moved to a smaller courtroom, which would require the jury to pass by the counsel table where they might see defendant's leg chains. The prosecutor suggested that defendant again wear a leg brace rather than leg chains. Defense counsel responded that defendant "has up to now requested that he be given chains rather than a leg brace. I would prefer the leg brace; however, at this point this morning I think my client's position is that he should have neither." The court stated: "I think that in view of the history of this case, and some of the statements made by Mr. Ramirez, that restraint is required in this case." The court, however, asked defendant whether he "wanted a hearing on this issue," adding, "I'd be happy to have a hearing on the issue. This morning, however, the issue is whether or not he is going to be restrained with shackles on his legs or with a more or less invisible leg brace and which is it to be? I mean, quite frankly, gentlemen, Mr. Ramirez has been in restraints the entire period of jury selection . . . . [¶] One or the other at this point, and if you want a hearing as to whether or not we ought to have any restraints at all, I will be happy to give that to you on a Friday sometime and we'll thrash it out." Defendant chose to keep the leg chains because the leg brace was "too

uncomfortable." Defendant did not request a hearing concerning whether restraints of any type were justified.

On January 30, 1989, the court again asked defendant whether he preferred wearing a leg brace that would not be visible to the jury, rather than leg chains. Defendant again chose to wear the leg chains.

At the conclusion of the guilt phase of the trial, the court instructed the jury, without objection by defendant, as follows: "You may have observed that the defendant has worn restraints while in the courtroom. This fact shall have no bearing upon your determination of the defendant's guilt or innocence. That determination must be based solely upon the evidence presented to you."

Although we could construe as an objection to the use of physical restraints defense counsel's passing comment that "I think my client's position is that he should have neither" a leg brace or leg chains, defendant failed to preserve this issue for review because, despite the court's invitation to resolve the issue at a later hearing, he did not request such a hearing or otherwise press for a ruling on the necessity for physical restraints. Defendant's failure to press the court for a ruling "deprive[ed] the trial court of the opportunity to correct potential error." (*People v. Morris* (1991) 53 Cal.3d 152, 195 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

■■■ Even without the court having held a hearing on this issue, it appears that the trial court did not abuse its discretion in ordering that defendant be physically restrained during trial. "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322], fn. omitted.) But the court's determination that physical restraints are needed will not be overturned on appeal "except on a showing of a manifest abuse of discretion." (*Id.* at p. 293, fn. 12.)

The trial court in the present case concluded that it was necessary to physically restrain defendant "in view of the history of this case, and some of the statements made by Mr. Ramirez." Defendant's bizarre actions following his arrest made it reasonable for the court to fear that defendant would act violently. When he was arrested, defendant invited the police to kill him, and asked to borrow a gun so he could kill himself. While in jail awaiting trial, defendant used his blood to draw a pentagram on the floor and write the number 666. In court, during his arraignment in municipal court, defendant

said, "Hail Satan," and displayed a pentagram and the number 666 on his palm. Under the circumstances of the present case, the trial court did not abuse its discretion in ordering defendant to be physically restrained during trial.

Because the record establishes a manifest need for some form of physical restraint, defendant cannot complain that a less visible form of restraint, such as a leg brace, should have been used rather than leg shackles. Defendant expressly chose to wear leg chains instead of a less visible, but more uncomfortable, leg brace, and has therefore waived any objection to that form of restraint.

### B. *Guilt Phase Issues*

#### 1. *Photographs of the Victims*

Defendant claims that the trial court erred in admitting into evidence photographs of eight of the victims because those photographs were irrelevant, gruesome, and highly inflammatory. Having viewed the photographs, we conclude, for the reasons that follow, that the photographs were properly admitted into evidence.

At trial, defendant objected to three photographs of murder victim Jennie Vincow lying on her bed as "very inflammatory" and gruesome. The prosecutor responded that the photographs were not unduly gruesome and were relevant to show that the body had been covered by a blanket (which affected the determination of the time of death), the nature and extent of her injuries, and the position of her clothing, which suggested a sexual assault. The court admitted the photographs, ruling that they were relevant and adding, "although they are not particularly pleasant to look at, they were not so unduly gruesome to inflame the jury."

The court admitted into evidence over defendant's objection that it was cumulative and irrelevant a photograph of Dale Okazaki lying dead on the floor with spilled groceries near her as she was found by law enforcement officers. Defendant unsuccessfully objected to a second photograph of the victim lying on the floor, arguing that it was irrelevant because the victim's body had been moved when it was examined and, thus, the photograph did not depict the scene as it was found by the investigators. The court also admitted a photograph of the victim's face taken at the autopsy despite defendant's objection "under 352." The court overruled the objection, stating: "It is not a pleasant picture, but it is certainly not unduly gruesome and does depict the wound causing death and the appearance of the victim . . . ."

Defendant objected to an autopsy photograph of Tsai-Lian Yu that showed a breathing tube in the victim's mouth, stating there was "some degree of

unpleasantness to the photograph" that was "not necessary." The court admitted the photograph, concluding it was "not objectionable under [Evidence Code section] 352 or any other criteria."

Defendant objected on grounds that they were "extremely grotesque and prejudicial" to photographs of Maxine Zazzara taken at the scene of the crime and during her autopsy, which showed that her eyes had been removed. The trial court overruled the objection, stating: "I find that their probative value far exceeds any inflammatory nature, although again, they are not pleasant to look at, but this is a murder case, but they would be useful certainly for a doctor to use to give the cause of death, perhaps the manner of death. It also would be useful just in general to indicate the manner or method of death . . . ." The court later added that although "they are not pleasant to look at," they are relevant and "as non-inflammatory as possible." The court, sua sponte, then gave the jury a cautionary instruction: "Ladies and gentlemen, we're going to have some photographs given to you for your examination of the scene at the Zazzara household. Now, quite frankly, the photographs are unpleasant. And also there will be a coroner's photograph of Mrs. Zazzara. You heard the description of the wounds that she suffered and these photographs do depict those wounds. Now, you must not allow yourselves to become inflamed against the defendant or any party to this lawsuit simply because these photographs are being shown to you. This is not the purpose of these photographs."

Defendant objected to a coroner's photograph of William Doi with a "breathing apparatus" in his mouth on the grounds that it is irrelevant "and also under [Evidence Code section] 352 it does have some foreign matter or other materials depicted that obviously are from something other than what was found at the scene." The court overruled the objection, finding "that the picture is not inflammatory and that it has . . . probative value certainly to identify the victim and it is not grotesque and it is not particularly repulsive . . . ."

Before showing the jury photographs of Mabel Bell and Florence L., to which defendant did not object, the court again remarked that "some of the photographs . . . are not pretty" but admonished the jury "not to be inflamed or in any other way emotionally involved in these photographs," asking the court to "look at them as neutrally and as objectively as you possibly can."

Defendant objected to a photograph of Mary Cannon taken at the scene of the crime and two coroner's photographs of the victim on the grounds that they were "sufficiently gory" and would "inflame the jury." Defendant described the photograph of the victim at the scene of the crime as "particularly hideous.". At the request of the court, the prosecutor withdrew the photograph of the victim taken at the scene of the crime. The court then

admitted into evidence the two coroner's photographs, stating: "I think they are necessary, . . . to identify the victim, and . . . to indicate the wound. . . . The body [has] been cleaned up and the great masses of blood have been eliminated, and they are not pretty, either one of them, but I think they are necessary for the purposes of this trial."

Defendant objected to three coroner's photographs of Lela Kneiding. The court admitted a photograph of the victim's face, which had a small wound on one cheek and two black eyes, noting that the court did not "see anything ghastly about it or inflammatory." The two remaining photographs depicted head wounds. After some discussion about whether both photographs depicted the same wound, at the court's suggestion, the prosecutor withdrew one of the photographs and the court admitted into evidence the other photograph.

 Whether the trial court erred in admitting into evidence the challenged photographs of the murder victims depends upon two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in determining that the probative value of each photograph outweighed its prejudicial effect. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

 It is clear that the challenged photographs were relevant. " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Defendant argues that the photographs "had little, if any, relevance to the determination of guilt." To the contrary, the photographs were highly relevant to show the manner in which the victims were killed and the severity of their injuries. (*People v. Heard* (2003) 31 Cal.4th 946, 973 [4 Cal.Rptr.3d 131, 75 P.3d 53]; *People v. Crittenden* (1994) 9 Cal.4th 83, 132–133 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The photographs also clarified the coroner's testimony. (*People v. Thomas* (1992) 2 Cal.4th 489, 524 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Several of the victims had similar injuries, such as distinctive neck wounds and black eyes, which supported the conclusion that these crimes were committed by the same person. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

 Nor did the trial court abuse its discretion in determining that the probative value of each photograph outweighed its prejudicial effect. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed

on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People v. Crittenden, supra*, 9 Cal.4th 83, 133–134.) "[A] court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner." (*People v. Coleman* (1988) 46 Cal.3d 749, 776 [251 Cal.Rptr. 83, 759 P.2d 1260].) "We have consistently upheld the introduction of autopsy photographs disclosing the manner in which a victim was wounded as relevant not only to the question of deliberation and premeditation but also aggravation of the crime and the appropriate penalty, all of which were at issue here. [Citations.]" (*People v. Cox* (1991) 53 Cal.3d 618, 666 [280 Cal.Rptr. 692, 809 P.2d 351].)

As noted above, the disputed photographs were highly relevant. The victims' wounds tended to prove, among other things, "the kind and degree of force used on the victims." (*People v. Crittenden, supra*, 9 Cal.4th 83, 134.) Although several of the photographs certainly are gruesome, especially the photograph of Maxine Zazzara with her eyes cut out, they were not unduly so. "[V]ictim photographs . . . in murder cases always are disturbing. [Citation.]" (*Ibid.*) The court carefully reviewed each photograph and, on one occasion, prevailed upon the prosecutor to withdraw a photograph that was particularly graphic and, on another occasion, to withdraw a photograph that was cumulative. (*People v. Thomas, supra*, 2 Cal.4th 489, 524.) The photographs at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes. The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors. The record reflects that the experienced trial judge was well aware of his duty to weigh the prejudicial effect of the photographs against their probative value, and carefully did so. (*People v. Coleman, supra*, 46 Cal.3d 749, 776.)

The trial court did not err in admitting the challenged photographs of the victims.

### 2. *Refusal to Remove Sunglasses*

Defendant asserts that the trial court erred in instructing the jury that it could consider whether defendant's refusal to remove his sunglasses as ordered by the court so that a witness could identify him showed a consciousness of guilt. Defendant asserts that this error "undermined" his defense "in violation of his right, inter alia, to fair trial, effective assistance of counsel, due process and fundamental fairness under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."

During his testimony regarding the murder of Tsai-Lian Yu, eyewitness Jorge Gallegos identified defendant, but added the observation, "he's just a little different," explaining, "his hair is just a little longer." On cross-examination, the following exchange occurred:

"[Defense Counsel]: . . . the man at the trial looks different than the man you saw that night.

"A. Yes.

"Q. The hair, the dress?

"A. Yes; the hair, the clothing, the glasses.

"Q. Okay. He doesn't look the same as he looked that night?

"A. No, he does not look the same. Can he stand?

"The Court: Would you like him to stand?

"[Gallegos]: Yes, I would like to see his profile without glasses and also from behind.

"[Defense Counsel]: Your honor, he has already made an I.D. I think this is just—

"The Court: Mr. Hernandez, you are making an issue of it. Mr. Ramirez, would you rise, please, take your glasses off and face my clerk.

"The Defendant: No.

"The Court: Very well. Thank you. The record will so reflect, the defendant has refused to stand, take his glasses off and face my clerk so that the profile could be seen by the witness."

At the close of the guilt phase of the trial, the court instructed the jury, over defendant's objection, that defendant's refusal to stand and remove his sunglasses "is not sufficient standing alone and by itself to establish the guilt of the defendant, but it is a fact which, if proved, may be considered by you in the light of all other facts in deciding whether defendant is guilty or not guilty. The weight to which such a circumstance is entitled and whether or not such conduct shows a consciousness of guilt are matters for your determination."

The jury properly could infer that defendant's refusal to remove his sunglasses so that the witness could better identify him demonstrated a consciousness of guilt in the same manner as a defendant's refusal to provide a handwriting exemplar. " '[T]he refusal of a defendant to provide an exemplar in violation of a court order is admissible evidence of the defendant's consciousness of guilt.' [Citations.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 153 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

Citing our decision in *People v. Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203], defendant argues that the trial court erred in failing to determine that the inference of consciousness of guilt was supported by sufficient evidence. Our decision in *Hannon* does not assist defendant. In that case, the trial court modified the standard jury instruction regarding consciousness of guilt to read, in part: " 'Now, evidence, *if there was any in this case*, that the defense attempted to suppress any evidence' " could show a consciousness of guilt. (*Id.* at p. 597, fn. 3.) We held that before the jury could be instructed that it could infer a consciousness of guilt, the trial court must determine as a matter of law whether there is "evidence in the record which, if believed by the jury, will sufficiently support the suggested inference." (*Id.* at p. 597.) This requirement is satisfied in the present case. Defendant refused to remove his sunglasses after being ordered to do so by the trial judge in open court. It is beyond question, therefore, that there is evidence in the record which, if believed by the jury, supports the inference that defendant's refusal indicates a consciousness of guilt. The trial court did not err in giving the challenged jury instruction.

### 3. *Discharge of Juror*

During jury deliberations at the guilt phase of the trial, the trial court discharged Juror Robert L., over defendant's objection, after receiving information from the jury foreperson that the juror had fallen asleep on two occasions. Defendant contends that this violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

On July 25, 1989, during the closing arguments of counsel, one of the jurors sent the court a note that read as follows: "As a seated juror in this case, I must state my concern regarding juror # 3, Mr. L[.]. As you are aware I am sure, he tends to catnap during the day. [¶] I am concerned with the fact that he has surely missed a great percentage of the testimony throughout this trial. [¶] Since we are nearing deliberations, I am concerned that he will not be able to input with total knowledge of what was testified to during the trial. [¶] This is also a concern of several of the other jurors and we were wondering if anything could be done to correct this situation."

In response, the court admonished the jury that it was important to be attentive, adding: "But if any of you feel that you have missed any of the evidence in a significant way . . . it is incumbent upon you, under the oath that you took as a juror, to bring that to the court's attention. It is no disgrace. These things happen."

On August 11, 1989, the 13th day of guilt phase deliberations, the trial court informed counsel that it had received from the jury foreperson a note that read: "Your Honor, Fellow jurors have brought it to my attention that juror # 3 Mr. Robert [L.] has fallen asleep on two occasions during our deliberations. I also have seen him not quite as attentive as a result of his dozing off. As foreman I find it my responsibility to bring this to your attention."

The court stated: "This is the juror that we have noticed behaving as if he were dozing off from time to time. It now appears that several jurors have indicated that—to the foreman that he has—or has fallen asleep. I'm disappointed, but I guess not exactly surprised." The trial judge remarked that he could not say the juror "has slept, but he certainly has jerked his head up abruptly from time to time as if he were nodding off or had nodded off and was awakening, but I cannot say that I have ever found him to be asleep."

The court conducted a hearing and asked the jury foreperson whether he had actually seen the juror asleep. The foreperson answered: "Yes, sir. Actually, I believe it was Tuesday, right before lunchtime, I believe about 11:30, he was sitting there and we're carrying on our normal deliberations, and you know, you could see he was nodding and then he just stood there, I would say about maybe a good four to five minutes maybe. And also I believe Wednesday after lunch, you know, we returned from lunch, we were sitting there right around maybe little bit about two o'clock, you know, I made a mental note of it, and he was sitting there. Again, you know, he was nodding and he was asleep because I could hear him snoring . . . ."

The court dismissed the juror over defendant's objection, stating: "I have from time to time observed Mr. L[.], as I have indicated before, nodding, and it seemed somewhat clear that—that Mr. L[.] was asleep or dozing or catnapping or doing something other than paying rapt attention to the proceedings. I probably, in an attempt not to embarrass Mr. L[.] too much, made some remarks to the jury in general and was looking at him in particular as I was making these remarks with regards to paying attention . . . but he even during argument occasionally would again bounce his head up and down quickly as if rudely awakening himself or something of that nature. The court finds that although I gave Mr. L[.] . . . the benefit of a reasonable doubt prior to today with regard to his attentiveness . . . it now is quite clear that good cause exists to excuse him because of his sleeping."

The court dismissed the juror, replaced him with one of the alternate jurors, and instructed the jury to begin its deliberations anew.

▮▮ "A trial court's authority to discharge a juror is granted by Penal Code section 1089, which provides in pertinent part: 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown to the court is found to be unable to perform his duty*, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors.' (Italics added; see also Code Civ. Proc., §§ 233, 234.) 'We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. [Citation.] If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.] We have also stated, however, that a juror's inability to perform as a juror must " 'appear in the record as a demonstrable reality.' " [Citation.]' [Citation.]" (*People v. Williams* (2001) 25 Cal.4th 441, 447–448 [106 Cal.Rptr.2d 295, 21 P.3d 1209], fn. omitted.)

A trial court does not abuse its discretion if it discharges a juror who falls asleep during the trial. (*People v. Johnson* (1993) 6 Cal.4th 1, 22 [23 Cal.Rptr.2d 593, 859 P.2d 673].) As we stated in *Johnson*, "the court's ruling excusing [the juror] can be sustained solely on the basis of its finding that [the juror] had fallen asleep during trial." (*Ibid.*) In the present case, the trial judge had observed that the juror had difficulty paying attention during trial and appeared to fall asleep. The judge's observations were consistent with the testimony of the jury foreperson that the juror had fallen asleep twice during deliberations. The trial court, therefore, did not abuse its discretion in discharging the juror.

### 4. *Murder of a Juror*

Defendant argues that he was denied his rights to due process and to trial by a fair and impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution because the trial court failed to conduct an adequate inquiry and declare a mistrial following the murder of a juror.

On August 14, 1989, the jury was unable to begin deliberations because one of the jurors, Phyllis Singletary, failed to appear. Eventually, the court released the jury for the day and instructed them to return the following day, telling them the court was "attempting to find out what exactly is going on with juror Singletary." The court admonished the jury, stating: "Please do not

concern yourself with this. It is something that you simply must not allow to interfere with your deliberations." The court added: "And again, please do not expose yourself to any news media representation about this case."

Shortly before 10:00 a.m. the following day, the court informed the jury that Juror Singletary had been shot to death for reasons unrelated to the present case. The court stated: "Her death is tragic and I think we all grieve for her, but what happened to her does not add or diminish anything to the evidence as to whether or not Mr. Ramirez is guilty or innocent of these charges. And I beg you to remember that in your deliberations." The court then selected an alternate juror to replace Juror Singletary and released the jury for the day, ordering them to return the following day and repeating the admonition to "not allow yourself any exposure to any media representation about this case."

The jury resumed deliberations the following day, August 16, 1989, but defendant moved to suspend deliberations to allow the jury a period of mourning. The court observed that when the jury arrived "all of them seemed, as far as appearances are concerned, able to carry on their tasks." The court asked the jury foreperson, outside the present of the rest of the jury, whether the jury was able to resume deliberations. The foreperson replied, "I feel that we can probably continue today," adding that "[e]veryone appears to have put it behind them." The court stated that it was "reasonably satisfied that the jurors are able to proceed with their deliberations and that upon further admonishment I propose that that is exactly what we do." Defendant objected.

The court informed the jury that Juror Singletary had apparently been killed by her boyfriend as "a result of a personal matter between the two people and it had nothing to do with this case. When the police approached the boyfriend, he killed himself." The court then again instructed the jury that the juror's death "was in no way connected with the case of People versus Richard Ramirez and should in no way be permitted to influence you in the performance of your duties as jurors as you deliberate the evidence in this case. You are admonished in the strongest possible terms that your decision in this case must be based on the evidence that you have seen and heard in this courtroom and from no other source." The court then instructed the jury to begin its deliberations anew.

On August 21, 1989, defendant filed a motion to voir dire the jurors regarding their reactions to the death of Juror Singletary. A hearing was held on August 31, 1989. The court denied the motion, remarking: "I have been observing the jury, and I did note on the day that I excused them, that they were visibly upset, quite frankly. That is why—one of the reasons I gave

them the day off. Since this time they have come back and they have, in my opinion, based on my observations, resumed their usual demeanor and apparent cheerfulness and ability to get about their business, and I think that is important to remember. . . . This court has had nothing that would put it on notice, either by the jury or by its own observations, that would indicate that this jury is not able to continue on with its deliberations. I believe that the deliberations of the jury are very near sacred in society and to interfere with them by allowing counsel to voir dire them about how they feel about Mrs. Singletary's death, how that has affected their deliberation, or even for the court to make such an inquiry, would probably be a fatal mistake . . . ."

On August 23, 1989, defendant filed a motion for a mistrial. The court denied the motion at a hearing on September 5, 1989.

The jury reached its verdicts on the guilt phase of the trial on September 20, 1989.

■ Defendant contends the trial court erred in failing "to conduct an inquiry into the jury's exposure to news coverage of Juror Singletary's death." Defendant did not raise this ground in the trial court and, thus, has forfeited this claim. (*People v. Saunders, supra,* 5 Cal.4th 580, 589, 590.) In any event, the record does not support defendant's assertion that the trial court erred in this regard. The court instructed the jury on several occasions, including before the circumstances of the juror's death were made public, to avoid media accounts. We assume that the jury followed the court's instructions (*People v. Davis* (2005) 36 Cal.4th 510, 545 [31 Cal.Rptr.3d 96, 115 P.3d 417]), and the record does not contain any indication to the contrary. In any event, defendant does not explain how he would have been prejudiced even had the jurors disregarded the court's instructions and viewed media accounts of the juror's murder. The juror's death had no connection to the present case and it is not apparent from the record that anything in the media accounts of the juror's murder would have affected the jury's deliberations.

■ Defendant argues the trial court "did not undertake a meaningful inquiry" into the effect on the jury of the juror's death because it "failed to inquire, for example, whether any of the jurors discussed the death of Juror Singletary, the manner of her death, or whether her death affected their ability to decide appellant's fate." Defendant objected to the jury's resuming deliberations the day after the jury learned of the juror's death, but defendant did not, at that time, ask the court to conduct a further inquiry of the jurors and, thus, has forfeited any argument that the court should have done so at that time. Defendant later asked the court to question the jurors regarding the effect of the juror's death, but the court was asked to rule on this request more than two weeks after the jury had resumed deliberations. The trial court

properly denied the request because it correctly was concerned that interrupting the jury's deliberations at that point to inquire about the effect of the juror's death would undermine the sanctity of deliberations. "California courts have recognized the need to protect the sanctity of jury deliberations. [Citations.]" (*People v. Cleveland* (2001) 25 Cal.4th 466, 475 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) One reason "is to ' "assure[] the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes." [Citation.]' [Citation.]" (*Ibid.*) "Jurors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny. The very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations." (*Id.* at p. 476.)

We find no fault with the trial court's response to this tragic event. The court appropriately released the jury the day it learned of the juror's murder and resumed deliberations the following day only after observing the jurors' demeanor and inquiring of the jury foreperson whether the jury was ready to resume deliberations. Whether a further inquiry was appropriate is a matter within the sound discretion of the trial court, which was in the best position to observe the jury. As we have noted regarding allegations regarding individual jurors: "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] . . . [¶] . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties . . . ." (*People v. Ray* (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

Defendant relies upon our decision in *People v. Beeler* (1995) 9 Cal.4th 953, 986–991 [39 Cal.Rptr.2d 607, 891 P.2d 153], in which the father of one of the jurors died while the jury was deliberating in the penalty phase of a capital trial. Rather than replace the juror with an alternate, the court ordered the jury to resume deliberations that Tuesday morning, telling the jury the court would recess before noon so the juror could fly out of state to attend the funeral and deliberations would resume the following Monday. The jury returned a verdict of death at 11:00 a.m. Although we held that the trial court did not abuse its discretion in ordering the jury to resume deliberations, defendant in the present case relies upon our added observation: "We do not suggest that a more detailed inquiry by the court would have served no purpose." (*Id.* at p. 989.)

It is not clear how defendant is assisted by our decision in *Beeler*, but any such assistance is lessened by the fact that the circumstances in *Beeler* differ greatly from those in the present case. Although the murder of a fellow juror

is shocking, defendant's attempt to equate that event with the death of a family member, especially a parent, is unavailing. And we declined to hold in *Beeler* that even "the death of a juror's parent is so debilitating that the juror is presumptively unable to deliberate." (*People v. Beeler, supra,* 9 Cal.4th at p. 990.)

Defendant also contends the trial court erred in denying his motion for mistrial. "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555 [127 Cal.Rptr.2d 802, 58 P.3d 931].) Nothing in the record before us supports the conclusion that defendant's chances of receiving a fair trial were irreparably damaged.

The trial court in the present case did not abuse its discretion in resuming deliberations the day after the jury learned that one of the jurors had been murdered.

### 5. *Sufficiency of Evidence of Burglary*

Defendant contends the evidence is insufficient to support his convictions of burglary of the residence of Maria Hernandez and Dale Okazaki, the felony murder of Okazaki based upon the commission of the burglary, and the special circumstance that the Okazaki murder was committed during the commission of a burglary.

As noted above, Hernandez testified that on March 17, 1985, about 11:00 p.m., defendant followed her into her garage and shot her as she was about to enter the condominium she shared with Okazaki. She fell to the ground and lay still while defendant entered the condominium. When the door to the condominium closed behind defendant, Hernandez opened the garage door and fled. She heard a "muffled loud sound" as she escaped and ran around to the front of the condominium complex where she saw defendant leaving the complex. Defendant pointed his gun at her, but then ran away. Okazaki had been shot to death in the head from close range. Her blouse had been pulled up.

Defendant contends there is insufficient evidence that defendant entered the residence with the intent to commit larceny because "[t]here was no evidence of theft, ransacking, or attempted taking of property." Defendant concedes that the evidence supports a finding that defendant entered the residence with the intent to commit murder or assault, but correctly notes that under the "merger doctrine" announced in *People v. Ireland* (1960) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580], such intent cannot support a finding of felony murder.

 "In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence— that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811].) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) A burglary is committed if the defendant enters a residence or other enumerated structure "with intent to commit grand or petit larceny or any felony." (§ 459.) But "the felony-murder rule and the burglary-murder special circumstance do not apply to a burglary committed for the sole purpose of assaulting or killing the homicide victim. [Citations.]" (*People v. Seaton* (2001) 26 Cal.4th 598, 646 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Accordingly, the jury was instructed that "[t]he crime of burglary requires the specific intent to commit larceny or theft" and further was instructed regarding the elements of the crime of larceny.[11]

 Although the circumstances of defendant's attempted murder of Hernandez and murder of Okazaki do not, standing alone, reveal the intent with which defendant entered the residence, the jury reasonably could have inferred that he intended to commit larceny by considering the circumstances of the other charged offenses. Evidence Code section 1101, subdivision (b), permits "the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as . . . intent . . .) other than his or her disposition to commit such an act." In order to be relevant to prove intent, the other crime "must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt, supra,* 7 Cal.4th 380, 402.)

The evidence is overwhelming that one of defendant's purposes in entering Hernandez and Okazaki's residence was to steal. With only one exception, there was evidence of the theft of property in each of the other charged crimes in which defendant entered a residence. In eight of these crimes, property later was recovered that had been stolen from the victim's residence. In several instances, surviving witnesses testified that defendant demanded money or other items of value during the crime.

---

[11] Because the jury was instructed to determine only whether defendant entered the residence with the specific intent to commit larceny, we do not consider whether the evidence that Okazaki was found with her blouse pulled up would have supported a finding that defendant entered the residence with intent to commit a sexual offense.

The prosecution presented the testimony of a person who had purchased stolen property from defendant on numerous occasions. The defense did not contest that defendant was a burglar. To the contrary, defendant presented testimony from a convicted burglar that she had committed burglaries with defendant.

The circumstance that there was no evidence of theft during the commission of the attempted murder of Hernandez and the murder of Okazaki does not establish that defendant did not harbor the intent to steal when he entered the residence. The jury reasonably could have concluded that defendant intended to steal, but was interrupted when Hernandez unexpectedly opened the garage door and fled. The jury reasonably could have concluded that defendant abandoned his plan to steal in order to flee and avoid apprehension.

The evidence is sufficient to support defendant's convictions for burglary of the Hernandez/Okazaki residence, felony murder of Okazaki based upon the commission of the burglary, and the special circumstance that the murder of Okazaki was committed during the commission of a burglary.

### 6. *Sufficiency of Evidence of Second Degree Murder of Yu*

Defendant challenges the sufficiency of the evidence to support his conviction of the second degree murder of Tsai-Lian Yu, asserting that the evidence is insufficient to establish malice because it does not establish that he intended to kill Yu and, if he did, that he did not act in the heat of passion, or upon a sudden quarrel, or in unreasonable self-defense. This contention is meritless.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Murder that is committed with malice but is not premeditated is of the second degree. (§ 189.)

As noted above, "In reviewing a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole, supra*, 33 Cal.4th 1158, 1212.) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft, supra*, 23 Cal.4th 978, 1053.)

From the evidence presented, the jury reasonably could have concluded that a few minutes after he shot Maria Hernandez and murdered Dale Okazaki, defendant used his car to force Yu's vehicle into the path of a parked car, left his car and forcibly removed Yu, who was a stranger to defendant, from her car as she pleaded for help, shot her twice as she struggled, then pushed her away and fled. The jury reasonably could have concluded that defendant acted with malice because he intentionally shot Yu twice at close range without provocation and acted with an abandoned and malignant heart. The evidence easily is sufficient to support defendant's conviction of second degree murder for killing Yu.

### 7. Cumulative Error

Defendant argues that the cumulative effect of errors during the guilt phase of the trial requires reversal of the judgment. As explained above, we discern no error when defendant's contentions are considered individually, and therefore find no cumulative error.

## C. Penalty Phase Issues

### 1. Conflict of Interest

As noted above, both the prosecution and the defense elected not to present any additional evidence at the penalty phase. Defense counsel stated that he had "done extensive work" interviewing potential witnesses in El Paso, Texas, and had located "witnesses who are willing to come forth," but the defense had made a "tactical decision" not to present any additional evidence at the penalty phase. Defendant personally waived his right to testify in his own behalf and stated that he agreed with his counsel's decision not to present any additional evidence at the penalty phase. The court accepted defendant's waiver.

Defendant does not contend on appeal that his waiver of his right to present penalty phase evidence was invalid or resulted in error, although he indicates he will raise such claims in a subsequent habeas corpus petition. Instead, echoing a claim addressed above, defendant asserts he was denied due process of law under the Sixth and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution because the trial court failed to inquire into defense counsel's possible conflicts of interest during the penalty phase.

Defendant asserts that "the trial court repeatedly was made aware of counsel's conflicts and difficulties in communicating with their client," citing instances in which either defendant failed to cooperate with his attorneys or

his attorneys failed to appear for trial. He fails, however, to explain how these instances evince what he describes as "ongoing potential conflicts of interest between appellant and trial counsel" that required an inquiry by the trial court.

Defendant, at one point in his opening brief, contends that his counsel's conflicts of interest with his family were the likely cause of his counsel's tactical decision not to present any mitigating evidence. Defendant admits, however, that "[c]ounsel's failure to present mitigating evidence on appellant's behalf . . . was not explained on the record." Defendant offers no support for his assertion that the "likely cause" of his attorneys' decision not to present further evidence at the penalty phase was a conflict of interest caused by his family, and we decline to speculate.

As noted above (*ante*, at pp. 424–428), defense counsel in the present case entered into a contract with both defendant and his family to represent defendant. The trial court conducted an extensive and appropriate inquiry into defendant's awareness of the possibility of a conflict of interest, offered defendant separate counsel to advise him, and obtained assurances from defense counsel that no such conflicts existed or were likely to arise. No error appears.

### 2. *Competency to Stand Trial*

We concluded above that the court did not err in denying prior defense counsel's pretrial motion to appoint a psychiatrist to evaluate defendant's mental competency to stand trial, nor did it err in failing prior to trial to order a competency hearing sua sponte. (*Ante*, at pp. 429–432.) Defendant claims that the trial court erred in failing to order a competency hearing during the penalty phase based upon additional "instances of appellant's bizarre behavior during guilt trial deliberations and on the occasion the jury returned its verdicts." Defendant relies upon his threats to disrupt and actual disruptions of trial proceedings, which caused the trial court to permit defendant to absent himself from the trial and listen to the proceedings in a holding cell. He also cites, as evidence of his "delusional thinking and probable mental incompetence," the following statement he made just before the court imposed sentence: "As for what is said of my life, there have been lies in the past and there will be lies in the future. I don't believe in the hypocritical moralistic dogma of this so-called society and need not look beyond this room to see all the liars, the haters, the killers, the crooks, the paranoid cowards, truly the trematodes[12] of the earth, each one in his own legal

---

[12] Trematodes are "parasitic worms, found in the bodies of various animals, having a flattish or cylindrical form, with skin often perforated by pores, and usually furnished with adhesive suckers." (18 Oxford English Dict., *supra*, p. 476.)

profession. You maggots made me sick. Hypocrites one and all. We are all expendable for a cause, and no one knows that better than those who kill for policy, clandestinely or openly, as do the governments of the world which kill in the name of God and country and for whatever else they deem appropriate. I don't need to hear all of society's rationalizations. I've heard them all before and the fact remains that is what it is. You don't understand me. You are not expected to. You are not capable of it. I am beyond your experience. I am beyond good and evil. Legions of the night,[13] night breed, repeat not the errors of night prowler and show no mercy. I will be avenged. Lucifer dwells within us all."

As noted above (*ante*, at p. 430), section 1368 provides: "(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . [¶] (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369." A trial court is required to conduct a competency hearing under section 1368 only if "substantial evidence of incompetence is introduced." (*People v. Hayes, supra*, 21 Cal.4th 1211, 1281.) " 'Substantial evidence is evidence that raises a reasonable doubt about the defendant's competence to stand trial.' [Citation.] Evidence . . . that does no more than form the basis for speculation regarding possible current incompetence is not sufficient. [Citation.]" (*Ibid.*)

As also noted above (*ante*, at p. 431), defendant's behavior did not raise a question as to his ability to understand the nature of the proceedings or assist counsel in his defense. "[M]ore is required to raise a doubt [as to a defendant's competence] than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (*People v. Laudermilk, supra*, 67 Cal.2d 272, 285.)

---

[13] The phrase "legions of the night" had been used in "heavy metal" rock lyrics around that time. The song "Legions" by Savatage, released in 1987, calls on the "legions of the night" to "To do our deeds." (<http://www.savatage.com/bandinfo/albums/hallofthemountainking/legions.html> [as of Aug. 7, 2006].) Similarly, the band Testament released in 1987 a song entitled "Alone in the Dark" that says that "Faustus prepares the legions of the night." (<http://www.darklyrics.com/lyrics/testament/thelegacy.html#8> [as of Aug. 7, 2006].)

Defendant has not made a showing that his mental condition resulted in an inability to assist in his defense or to understand the proceedings. The trial court did not err in failing to order a competency hearing sua sponte during the penalty phase.

### 3. *Absence of Mitigating Evidence*

Defendant acknowledges that this court repeatedly has rejected the contention that a defendant's decision not to present mitigating evidence at the penalty phase, in itself, renders the determination of penalty unreliable under the federal and California Constitutions. (*People v. Massie* (1998) 19 Cal.4th 550, 570 [79 Cal.Rptr.2d 816, 967 P.2d 29], and cases cited therein.) He argues nonetheless that "[e]volving due process standards and requirements of reliability of the death sentencing procedure have undermined the Court's analysis in those cases."

"We have repeatedly stressed . . . that a defense counsel's failure to present mitigating evidence at the penalty phase does not make the proceeding unreliable in constitutional terms so long as (1) the prosecution has discharged its burden of proof at both phases of trial consistently with the rules of evidence and a constitutionally sound death penalty scheme; (2) the death verdict was rendered in accordance with proper instructions and procedures; and (3) the penalty jury considered the relevant mitigating evidence, if any, that the defendant has chosen to introduce. [Citations.]" (*People v. Lewis, supra,* 25 Cal.4th 610, 676; see *People v. Blair* (2005) 36 Cal.4th 686, 737 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) Defendant has presented no persuasive reason to reconsider our previous holdings.

### 4. *CALJIC No. 8.85*

Defendant claims he was denied his right to a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, because the trial court erred in instructing the jury in accordance with CALJIC No. 8.85,[14] which quotes the aggravating and mitigating factors identified in section 190.3 the jury shall consider, if relevant, in determining the proper penalty, because the court did not delete references to mitigating factors for which no evidence was introduced. According to defendant, this

---

[14] The jury was instructed:

"In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crimes of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

led the jury to "treat the absence of mitigation as aggravation." If defendant believed the pattern instruction "was unclear, he had the obligation to request clarifying language." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192 [36 Cal.Rptr.2d 235, 885 P.2d 1].) In any event, we repeatedly have held that instructions in the language of CALJIC No. 8.85 do not violate the Eighth and Fourteenth Amendments by failing to delete inapplicable sentencing factors or delineate between aggravating and mitigating circumstances. (*People v. Schmeck* (2005) 37 Cal.4th 240, 305 [33 Cal.Rptr.3d 397, 118 P.3d 451]; *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

### 5. *Special Jury Instructions*

Defendant proposed 10 special jury instructions during the penalty phase. The trial court gave one of the proposed instructions, refused five of them, and defendant withdrew the remaining four. Defendant contends that the trial court erred in denying his request for four of the refused instructions and two that he withdrew, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

#### a. *Sympathy*

Defendant requested a special instruction regarding sympathy:

"(b) The presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offenses the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

"In the guilt phase of this case, you were instructed that you should not base your verdict on various irrelevant matters, including sympathy.

"You are now instructed that sympathy <u>does</u> play a legitimate part in determination of whether a defendant shall suffer death, or be imprisoned for life without the possibility of parole.

"If after consideration of all the circumstances, you feel sympathy for the defendant that is based on the evidence you have heard, and based on such sympathy you are inclined to extend mercy to the defendant, the law permits you to act upon such sympathy and fix the penalty at life imprisonment without the possibility of parole."

The court refused to give this instruction because it is argumentative.

The court instructed the jury that in determining the proper penalty it should disregard the instructions given at the guilt phase of the trial and consider "any sympathetic or other aspect of the defendant's character or record," adding again, "You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." The jurors further were instructed that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."

 "We have suggested that 'in appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . . But a trial court need not give a pinpoint instruction if it is argumentative [citation] [or] merely duplicates other instructions [citation] . . . ." (*People v. Bolden, supra,* 29 Cal.4th 515, 558.) We agree with the trial court that defendant's requested special instruction on sympathy was argumentative and, in any event, the proposed instruction properly was denied because it duplicated other of the court's instructions.

b. *Mitigating Evidence*

Defendant also requested two special instructions regarding mitigating factors. One stated: "The weight to be given to the factors in aggravation and mitigation is a matter for each juror to determine. Each juror must assign the factors present in this case whatever weight the juror finds to be appropriate. For this reason, one mitigating factor can sometimes outweigh a number of aggravating factors in a particular case. No juror is ever required to vote to impose the penalty of death if the juror is not convinced that death is the appropriate penalty under the circumstances shown by the evidence." The court denied this instruction as duplicative and argumentative.

The other requested instruction on mitigating factors stated: "With regard to factors in mitigation, offered by the defendant as reasons to impose a sentence [of life imprisonment without parole] [less than death], each juror must make his or her own individual assessment of the weight to be given to such evidence. There is no requirement that all jurors unanimously agree on any matter offered in mitigation. Each juror makes an individual evaluation of each fact or circumstance offered in mitigation of penalty. Each juror should weigh and consider such matters regardless of whether or not they are accepted by other jurors." The court refused this instruction as argumentative and duplicative.

The court instructed the jury that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." We need not, and do not, decide whether the trial court was correct that these proposed special instructions on mitigating factors were argumentative because, in any event, the trial court properly denied the requested instructions because they duplicated the court's instructions.

### c. *Aggravating Factors*

Defendant further asked the court to instruct the jury that the list of aggravating factors is exclusive: "I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be appropriate punishment in this case." The court refused the instruction, stating it saw no reason to give it.

In addition to reading the list of factors set forth in section 190.3 and recounted in CALJIC No. 8.85 that the jury should consider in determining the penalty, the court instructed the jury that "[a]n aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself."

We previously have rejected the argument that the court must instruct the jury that it cannot consider nonstatutory aggravating evidence. "The court gave the standard sentencing instruction (see CALJIC No. 8.85), and we have held that instruction is proper despite its failure expressly to limit aggravating evidence to the enumerated statutory factors, and to exclude nonstatutory factors as a basis for the death penalty. [Citation.]" (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]; see *People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

### d. *Defendant's Age*

Defendant requested the following jury instruction: "One of the factors for you to consider in determining the penalty is the age of the defendant at the time of the offense(s). Chronological age, by itself, is a matter over which the defendant has no control, and which is not relevant to the choice of penalty. However, the factor relating to 'defendant's age,' as set forth in these instructions, refers to any matter concerning defendant's age, maturity, and judgment which common experience or morality might indicate to be relevant to the issue of penalty. You shall therefore give any age-related factors and argument consideration in arriving at a judgment as to penalty."

Defendant later withdrew this instruction:

"The Court: I do not believe . . . that this instruction is pertinent to any evidence that I've heard in this case.

"[Defense Counsel]: Withdraw this one.

"The Court: All right."

The court later instructed the jury that in determining the penalty it should consider "The age of the defendant at the time of the crime." Defendant was 24 years old at the time of the first charged crime.

Defendant argues that trial counsel withdrew the requested instruction "only in response to the court's request," adding that trial counsel "obeyed the court and withdrew the instruction." But the court did not order, or even ask, trial counsel to withdraw the request, it merely observed that the proposed instruction did not appear to pertain to any evidence introduced at trial. Rather than explain why the proposed instruction was proper and request a ruling, trial counsel simply withdrew the proposed instruction. In order to preserve an issue for review, a defendant must not only request the court to act, but must press for a ruling. The failure to do so forfeits the claim. (*People v. Braxton* (2004) 34 Cal.4th 798, 813 [22 Cal.Rptr.3d 46,

101 P.3d 994]; see also *People v. Anderson* (2001) 25 Cal.4th 543, 599, fn. 19 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

Even had defendant properly preserved the issue for appeal, the claim lacks merit because the instruction given as to age was sufficient. Defendant argues that merely instructing to jury to consider "[t]he age of the defendant at the time of the crime" does not provide adequate guidance as to how the jury should apply age to the penalty determination. Defendant cites *People v. Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052], in which we held that age cannot be solely a mitigating factor and observed that "the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*Ibid.*)

As the trial court correctly observed, no "age-related matter" was suggested by the evidence in this case. (Cf. *People v. Smithey* (1999) 20 Cal.4th 936, 1004 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [mental age a mitigating factor].) Accordingly, the court's instruction to consider defendant's age, without further elaboration, was sufficient in this case.

### e. *Life Without Parole*

Defendant submitted the following proposed jury instruction: "Statements by some jurors during jury selection showed an awareness of news reports concerning other cases where sentences of death were not carried out for legal reasons or where persons sentenced to life imprisonment have been considered for parole. Under the 1978 Death Penalty Law, which governs this case, the only possible penalties are death or life imprisonment without the possibility of parole. In the past, other cases were decided under other laws which are no longer in effect. You must not consider other cases or news reports, or speculate about actions for other authorities in arriving at a penalty verdict in this case. Those are matters that must not affect your verdict."

Defendant later withdrew this instruction:

"The Court: . . . I think this is an area that I would not and in fact I am bound not to bring forth unless the jury itself raises the question during their deliberations. I think to give this instruction would be error and I'm going to ask you to withdraw it.

"[Defense Counsel]: Withdrawn.

"The Court: Thank you."

Defendant contends that trial counsel withdrew the requested instruction "only in response to the court's request," adding that trial counsel "obeyed the court and withdrew the instruction." But the court did not order trial counsel to withdraw the request, it merely asked him to do so after explaining why the court concluded the proposed instruction was improper. Trial counsel could have respectfully disagreed and asked the court to rule on his request but, instead, withdrew the proposed instruction, thus forfeiting this issue. (*People v. Braxton, supra*, 34 Cal.4th 798, 813.)

In any event, the proposed instruction was improper. As defendant acknowledges, we repeatedly have rejected the claim that the court should instruct the jury that a sentence of death means the defendant definitely will be executed and a sentence of life in prison without parole means the defendant never will be paroled because such an instruction would be inaccurate. "The Governor may ameliorate any sentence by use of the commutation or pardon power . . . ." (*People v. Arias, supra*, 13 Cal.4th 92, 172; see *People v. Ward* (2005) 36 Cal.4th 186, 220 [30 Cal.Rptr.3d 464, 114 P.3d 717].) "We have further determined that refusal to so instruct does not contravene any constitutional requirement. [Citation.]" (*People v. Ward, supra*, 36 Cal.4th at p. 220.)

### 6. *CALJIC No. 8.84.1*

Defendant contends he was denied his right to due process and to a reliable determination of penalty under the Eighth and Fourteenth Amendments to the federal Constitution because the court instructed the jury in accordance with CALJIC No. 8.84.1 that it "must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise." Defendant argues that this instruction erroneously permitted the jury to consider aggravating factors not listed in section 190.3.

The instruction was proper: "The evidence introduced by the prosecution at the guilt phase of defendant['s] trial was relevant to prove defendant[] guilty of the murders charged in this case. So long as it considered the evidence offered at the guilt phase of trial solely for this purpose, the jury was entitled to take into account all of the evidence offered at the guilt phase as part of the 'circumstances of the crime,' an aggravating factor that the jury may consider in its penalty deliberations. (§ 190.3, factor (a).) Therefore, the trial court did not err when it instructed the jury that it could consider guilt phase evidence in its penalty deliberations." (*People v. Champion* (1995) 9 Cal.4th 879, 946–947 [39 Cal.Rptr.2d 547, 891 P.2d 93]; see *People v. Harris* (2005) 37 Cal.4th 310, 359 [33 Cal.Rptr.3d 509, 118 P.3d 545].)

We recognized in *Champion* that it is possible the jury might improperly consider at the penalty phase evidence introduced at the guilt phase to show bad character. The court, however, has no sua sponte duty to instruct the jury not to do so. (*People v. Champion, supra,* 9 Cal.4th 879, 947.) In the present case, defendant did not request such a limiting instruction. Defendant did ask the court to instruct the jury that the list of aggravating factors is exclusive, but, as discussed above, the court properly refused to so instruct the jury. (*Ante,* at pp. 470–471.) This proposed instruction, moreover, would not have prevented the jury from considering evidence introduced at the guilt phase for an improper purpose, such as to show defendant's bad character.

### 7. *Impact of Guilt Phase Errors*

Defendant argues that the effect of numerous errors committed during the guilt phase of the trial rendered the penalty determination unreliable. This argument is based upon a faulty premise. As discussed above, defendant has failed to show any errors occurred during the guilt phase of his trial.

### 8. *Burden of Proof*

Defendant contends the trial court erred in failing to instruct the jury that it must determine the proper penalty beyond a reasonable doubt. As defendant recognizes, we have repeatedly rejected this contention. "Contrary to defendant's contention, '[t]he death penalty is not unconstitutional for failing to impose a burden of proof-whether beyond a reasonable doubt or by a preponderance of the evidence-as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence.' [Citation.] Nor, contrary to defendant's claim, do the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], alter this conclusion . . . ." (*People v. Cornwell* (2005) 37 Cal.4th 50, 103–104 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

### 9. *Double-counting Special Circumstances*

The court instructed the jury, pursuant to CALJIC No. 8.85, that it could consider under section 190.3, factor (a), the circumstances of the crime and the existence of any special circumstances, and could consider under section 190.3, factor (b) criminal activity other than the crimes charged in the present case. Defendant argues that these instructions, coupled with the prosecutor's argument that the jury should consider "each of these murders in turn, the first degree murders, and each of the special circumstances in turn, and make

a decision on each one," impermissibly invited the jury to "double-count" the special circumstances, in violation of our decision in *People v. Melton* (1988) 44 Cal.3d 713, 768–769 [244 Cal.Rptr. 867, 750 P.2d 741]. He further contends that these instructions and argument rendered the penalty determination unreliable, in violation of the Eighth and Fourteenth Amendments to the federal Constitution.

In *People v. Melton, supra,* 44 Cal.3d 713, 768, we recognized a "theoretical problem" in section 190.3, factor (a), because it directs the jury to consider both the "circumstances of the crimes" and "the existence of any special circumstances." We noted: "Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' On defendant's request, the trial court should admonish the jury not to do so." (*Melton,* at p. 768.) We were quick to point out, however, that "the possibility of actual prejudice seems remote . . . ." (*Ibid.*)

Defendant did not request an instruction admonishing the jury not to double-count the special circumstances, and we repeatedly have held that the trial court has no duty to so instruct the jury sua sponte. (*People v. Young* (2005) 34 Cal.4th 1149, 1225 [24 Cal.Rptr.3d 112, 105 P.3d 487]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1180 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Cain* (1995) 10 Cal.4th 1, 68 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

Defendant asserts that the prosecutor in closing argument "in effect told the jury to double-count the special circumstances." To the contrary, the prosecutor expressly told the jury not to do so. After quoting the pertinent language from section 190.3, factor (a), as reflected in CALJIC No. 8.85, the prosecutor told the jury: "You may consider those crimes [of which defendant was convicted] in aggravation in determining penalty in this case only once; you can't consider them in section a and section b. You can consider them only once."

10. *Lack of Specific Findings Regarding Aggravating Factors*

Defendant maintains that the trial court's failure to require the jury to make findings regarding which aggravating factors it relied upon precluded meaningful appellate review in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and deprived him of equal protection of the laws under the Fourteenth Amendment. As defendant acknowledges, we previously have rejected this contention. (*People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Vieira* (2005) 35 Cal.4th 264, 303 [25 Cal.Rptr.3d 337, 106 P.3d 990].)

### 11. *Triple Use of Facts*

Defendant argues the death penalty statute in effect at the time of defendant's trial permitted "capricious infliction of punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments" to the federal Constitution because it permitted the jury to consider the same facts in determining defendant's guilt of the charged offenses, the truth of the special circumstance allegations, and the proper penalty. We repeatedly have upheld such "triple use" of the same facts. (*People v. Smith* (2003) 30 Cal.4th 581, 641 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676].)

### 12. *Prosecutorial Discretion*

Defendant argues that granting prosecutors "virtually unfettered discretion" to decide whether to seek the death penalty violates the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. As defendant recognizes, we repeatedly have rejected this claim. (*People v. Gray, supra,* 37 Cal.4th 168, 237; *People v. Martinez* (2003) 31 Cal.4th 673, 703 [3 Cal.Rptr.3d 648, 74 P.3d 748].)

### 13. *Failure to Narrow Class of Death-eligible Defendants*

Defendant contends that the death penalty statute applicable in this case failed to meaningfully narrow the class of defendants eligible for the death penalty, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Defendant correctly observes that we repeatedly have rejected this contention. (*People v. Gray, supra,* 37 Cal.4th 168, 237.)

### 14. *Cumulative Error*

Defendant argues that the cumulative effect of errors in the guilt and penalty phases of the trial requires reversal of the judgment. As explained above, reversal of the judgment is not required because there were no significant errors in defendant's trial.

### 15. *Order of Sentences*

Defendant maintains that he was deprived of his rights under the Eighth and Fourteenth Amendments to the federal Constitution because the trial court ordered that his determinate sentence of more than 59 years be served after execution of the death sentence. On November 7, 1989, the trial court sentenced defendant to death on his 12 convictions for first degree murder with special circumstances and a term of 59 years four months on his 11

convictions of noncapital crimes. The court denied the prosecutor's request to stay the determinate sentence pending execution of the death sentence, but ordered that the determinate sentence be served after the death sentence was imposed. On November 15, 1989, the court modified the sentence nunc pro tunc to add: "The sentences on the noncapital counts are ordered to be consecutive to, and to be served subsequent to, and only upon completion of, the death sentences enumerated above . . . ."

■■■ Citing our decision in *People v. Price* (1991) 1 Cal.4th 324 [3 Cal.Rptr.2d 106, 821 P.2d 610], defendant asserts that "[w]hen a greater sentence is imposed upon a defendant, the lesser sentence must be stayed pursuant to the bar against multiple punishment under section 654." This is an overstatement. Section 654 bars multiple punishment for a single "act or omission." "Although it 'literally applies only where such punishment arises out of multiple statutory violations produced by the "same act or omission," ' we have extended its protection 'to cases in which there are several offenses committed during "a course of conduct deemed to be indivisible in time." [Citation.]' [Citation.]" (*People v. Oates* (2004) 32 Cal.4th 1048, 1062 [12 Cal.Rptr.3d 325, 88 P.3d 56].) In the present case, the determinate sentences were imposed for crimes that were committed separately from, or involved victims other than, the murders for which defendant was sentenced to death. Section 654 does not, therefore, preclude imposition of both the determinate sentences and the death sentences.

Defendant relies upon section 669, which states, in pertinent part: "Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first . . . ." Although recognizing that "the death sentence imposed here was not a life term," defendant argues that it "was the functional equivalent of a life sentence in that appellant was sentenced to spend the rest of his life in prison."

■■■ By its terms, the portion of section 669 regarding imposition of a life sentence does not apply to a sentence of death. Accepting defendant's position would further delay for decades the imposition of the death sentences. This would be contrary to the declaration of legislative intent in section 190.6, subdivision (a), "that the sentence in all capital cases should be imposed expeditiously." Accordingly, the trial court did not err in ordering the sentence of death be imposed prior to imposition of the determinate sentence on defendant's noncapital crimes.

### 16. *Methods of Execution*

Defendant claims that the methods of execution of either lethal injection or, at defendant's election, the gas chamber, deprives him of due process,

because the state has failed to develop proper standards for the administration of lethal injection, and both methods constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment to the federal Constitution.

"As this court repeatedly has recognized, . . . such claims are not cognizable on direct appeal, because 'an imperfection in the method of execution does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal.' [Citations.] On direct appeal, defendant is restricted to claims 'bear[ing] on the validity of the death sentence itself.' [Citation.] His claim regarding the existence or nonexistence of regulations that may or may not be in effect when the judgment is to be carried out does not affect the validity of the death sentence. In essence, defendant's claim is premature. [Citation.]" (*People v. Cornwell, supra*, 37 Cal.4th 50, 105–106.)

17. *International Law*

Defendant contends he "was denied both the right to a fair trial by an independent tribunal and the right to the minimum guarantees for a criminal defense under customary international law as informed by the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights (ICCPR), and the American Declaration of the Rights and Duties of Man (American Declaration)." Defendant further asserts he "suffered racial discrimination . . . which constituted violations of customary international law."

This claim fails because, as explained above, defendant was not denied a fair trial or subjected to racial discrimination. "To the extent defendant alleges violations of the International Covenant on Civil and Political Rights, which he alleges incorporates the Universal Declaration of Human Rights, his claim lacks merit, even assuming he has standing to invoke this covenant. (*People v. Turner* [(2004)] 34 Cal.4th [406,] 439–440 [20 Cal.Rptr.3d 182, 99 P.3d 505]; *People v. Brown* [(2004)] 33 Cal.4th [382,] 404 [15 Cal.Rptr.3d 624, 93 P.3d 244] [' "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements" '].)" (*People v. Cornwell, supra*, 37 Cal.4th 50, 106; *People v. Harris, supra*, 37 Cal.4th 310, 366.)

## DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 27, 2006.